TRANSCONTINENTAL INSURANCE COMPANY, as subrogee of the Estate of Reabon Jackson, Jr., Reabon Drusila Jackson (a minor), Nettie Adams, and Donald Robinson; and Selener Love, individually and as next friend of Reabon Drusila–Karetta–Pashion Jackson, Appellants,

v.

BRIGGS EQUIPMENT TRUST and Genie Industries, Inc., Appellees.

No. 14–08–00795–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 3, 2010.

686

Loren R. Smith, Joan O. Nwuli, Houston, for appellants.

Casey Allen Bell, Clifford L. Harrison, Houston, for appellees.

Panel consists of Justices FROST, BOYCE, and SULLIVAN.

## OPINION

KEM THOMPSON FROST, Justice.

We review the trial court's granting of three summary judgments dismissing wrongful-death claims by a mother and her child and subrogation claims asserted by a workers' compensation carrier against the manufacturer and lessor of industrial equipment. We affirm the trial court's judgment as to the mother's claims individually and as next friend of her child. Based on fact issues precluding summary judgment, we reverse the judgment as to all of the subrogation carrier's claims and remand these claims to the trial court.

### I. Factual and Procedural Background

The Congregation Beth Yeshurun ("Congregation") wished to replace lightbulbs in its sanctuary. Because these lightbulbs were approximately forty feet from the floor, a lift was needed for the Congregation workers to replace the lightbulbs. Through Lakey Electric Company, defendant/appellee Briggs Equipment Trust ("Briggs") rented to the Congregation a Genie AWP 40 hydraulic lift with personnel platform ("Lift") as well as a "Super Straddle." The Super Straddle is a frame-like base device on which the Lift can be mounted, enabling the Lift to be used in locations where the floor is sloped or where there are objects fixed to the floor, such as seats. Defendant/appellee Genie Industries, Inc. ("Genie") manufactured the Lift and Super Straddle.

Congregation employee Reabon Jackson, Jr. ("Jackson") was raised on the personnel platform of the Lift while it was on the Super Straddle. The Lift became unstable and tilted over, causing Jackson to fall to his death and injuring another Congregation employee, Donald Robinson.

The day after Jackson's death, September 5, 2002, Selener Love, a woman with whom Jackson had not been ceremonially married, gave birth to a daughter, whom Love alleges is Jackson's child ("Child"). Appellant/plaintiff Transcontinental Insurance Company ("Transcontinental"), the Congregation's workers' compensation carrier, paid benefits to Robinson, Jackson's estate, Nettie Adams (Jackson's mother), and for the benefit of the Child. Asserting statutory and contractual subrogation, Transcontinental filed suit in the trial court as subrogee of Robinson, Jackson's estate, Jackson's mother, and the Child. Transcontinental asserted negligence and strict-products-liability claims against Briggs and Genie based on Jackson's injuries and death and Robinson's injuries. As to Jackson, these claims were based on (1) wrongful-death claims in favor of the Child and Jackson's mother and (2) a survival action in favor of Jackson's estate. Transcontinental also alleged that Briggs was liable under section 82.003 of the Texas Civil Practice and Remedies Code, which governs the liability of nonmanufacturing sellers.

Love intervened, contending that Jackson was her common-law spouse and that Jackson was the Child's biological father. Love asserted wrongful-death and loss-of-consortium claims on her own behalf and on the Child's behalf. Love did not seek workers' compensation death benefits as Jackson's widow, but she did seek and receive death benefits on behalf of the Child. The hearing officer in the compensation proceeding found that the Child is Jackson's daughter, without the benefit of any evidence of genetic testing.

Jackson's mother, however, stated that she heard Jackson and Love talking about Love's pregnancy and that Jackson said he

did not know whether he was the Child's father. Because of this issue as to whether the Child is Jackson's daughter, Briggs and Genie (collectively, the "Defendants") filed a motion for court-ordered paternity testing. In the motion, the Defendants stated that Love, as next friend of the Child, had the burden of proving by clear and convincing evidence that the Child is Jackson's daughter. The Defendants asked the trial court to order genetic testing by using Jackson's blood sample from the Harris County Medical Examiner and buccal swabs from Love and the Child. The Defendants asserted that this case included a proceeding to determine parentage under Chapter 160 of the Texas Family Code, under which the trial court can order genetic testing. Transcontinental opposed the motion, arguing, among other things, that Chapter 160 does not apply as asserted by the Defendants. Transcontinental also requested that, if testing were ordered, the Defendants waive any privileges and that all results be submitted to Transcontinental's counsel. In a reply, the Defendants asserted that they were not trying to engraft the requirements of the Family Code onto the wrongful-death statute but that they were arguing that genetic testing is allowed in cases such as this under Supreme Court of Texas precedent. The Defendants agreed to waive any privilege and requested that all testing results be submitted to Transcontinental's counsel.

The trial court granted the Defendants' motion and ordered genetic testing by Identigene in August 2005. However, the trial court added handwritten language to the proposed order requiring that the test results be sealed, filed in camera, and not be disclosed to any party absent a further order from the trial court. In October 2006, Identigene submitted a one-page report under seal to the trial court in camera ("Identigene Report"). The Defendants later filed an unopposed motion to disclose

the paternity-test results. The trial court granted the motion and ordered that the paternity-test results previously presented to the trial court under seal be "produced to lead counsel of record for each party in this case." The trial court, however, later refused to release the paternity-test results. Though the trial court allowed counsel to view the results in camera at the courthouse, the trial court did not permit counsel or the parties to make or retain copies of the test results. Transcontinental lodged objections to the test results.

Shortly before a July 9, 2007 trial setting, the Defendants filed a motion for continuance. The trial court called the case to trial on July 10, 2007. At first, the Defendants refused to announce "ready" unconditionally; instead, they announced "ready" subject to the necessity of taking additional discovery and subject to a motion for summary judgment that they wanted to file and have heard before trial. The trial court stated that, if the Defendants announced "ready" unconditionally, then the trial court might recess the trial to allow the parties to finish up a few matters, such as the completion of mediation, additional discovery, and filing a motion for summary judgment. The Defendants then announced "ready," and the trial court stated that the case was "in trial" but that the trial would be recessed for a reasonable time for completion of these matters.

The following month, the Defendants filed four motions for summary judgment. In the first ("First Motion"), the Defendants asserted a no-evidence motion against most of the essential elements of Transcontinental's claims and Love's claims. In the second motion for summary judgment ("Second Motion"), Briggs asserted traditional and no-evidence grounds, claiming that the products-liabili-

ty claims against Briggs fail under Chapter 82 of the Texas Civil Practice and Remedies Code, which applies to products-liability actions. In the third motion ("Third Motion"), the Defendants sought a traditional and no-evidence summary judgment, asserting that the genetic testing that was under seal conclusively proved that the Child was not Jackson's daughter and therefore was not entitled to recover under the wrongful-death statute. In the fourth motion for summary judgment ("Fourth Motion"), the Defendants asserted no-evidence grounds against Love's claims, attacking the essential element that Love be Jackson's surviving spouse.

Transcontinental filed a summary-judgment response with accompanying evidence, including objections to the admission of the Identigene Report. Love also filed a summary-judgment response. The Defendants filed various objections to Transcontinental's summary-judgment evidence.

All four motions were submitted with oral argument on August 27, 2007. At that hearing, the trial court asked the parties to agree on a new submission date for the motions. However, the record reflects that the parties were unable to agree and that the submission date for the motions was never re-set.

A few months later, on October 9, 2007, the Defendants filed a reply in which they attached two chain-of-custody affidavits. They also noted that Identigene had submitted an affidavit from Dr. Laura Gahn, together with chain-of-custody documents, under seal to the court but that these documents had not been produced to or reviewed by any party in the case, including the Defendants ("Gahn Affidavit"). The Gahn Affidavit was filed with the court under seal on October 5, 2007. Transcontinental objected that these materials had not been provided to Transcontinental. The trial court did not give the Defendants leave to file any late summary-judgment evidence.

The trial court granted the first three summary-judgment motions and dismissed with prejudice all claims asserted by Transcontinental and Love. The trial court denied the Fourth Motion. Nowhere in the record did the trial court rule or refuse to rule on any of the parties' summary-judgment objections, and no party sought a ruling on these objections or objected to any refusal to rule on these objections.

Transcontinental and Love have both appealed. On appeal, Transcontinental has filed an unopposed motion to unseal the Identigene Report and the Gahn affidavit.

## II. ISSUES PRESENTED

Love asserts in three issues that the trial court erred in granting the three summary-judgment motions. Transcontinental presents five issues in which it challenges the three summary judgments granted in favor of Briggs and Genie and the trial court's failure to sustain objections to some of the Defendants' summary-judgment evidence.

## III. STANDARDS OF REVIEW

In a traditional motion for summary judgment, if the movant's motion and summary-judgment evidence facially establish its right to judgment as a matter of law, the burden shifts to the nonmovant to raise a genuine, material fact issue sufficient to defeat summary judgment. *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex.2000). In reviewing a no-evidence summary judgment, we ascertain whether the nonmovant pointed out summary-judgment evidence raising a genuine issue of fact as to the essential elements attacked in the no-evidence motion. *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 206–08

(Tex.2002). In our de novo review of a trial court's summary judgment, we consider all the evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Mack Trucks, Inc. v. Tamez,* 206 S.W.3d 572, 582 (Tex.2006). The evidence raises a genuine issue of fact if reasonable and fair-minded jurors could differ in their conclusions in light of all of the summary-judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes,* 236 S.W.3d 754, 755 (Tex.2007). When, as in this case, the order granting summary judgment does not specify the grounds upon which the trial court relied, we must affirm the summary judgment if any of the independent summary-judgment grounds is meritorious. *FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 872 (Tex. 2000).

## IV. ANALYSIS

### A. *Did the trial court err in granting summary judgment against Love's claims?*

■ Love challenges the trial court's granting of the three summary-judgment motions. Though in all four motions the Defendants attacked Love's claims in some way, in the trial court, Love only filed a response in opposition to the Fourth Motion, in which the Defendants asserted there is no evidence that Love is Jackson's surviving spouse. The trial court denied the Fourth Motion; however, in the First Motion, the Defendants asserted no-evidence grounds challenging an essential element of at least one element of all of Love's claims. Love's failure to respond is fatal to her ability to successfully assert on appeal that the trial court erred in granting the First Motion as to her claims. *See Lee v. Palacios,* No. 14–06–00428–CV, 2007 WL 2990277, at *2 (Tex.App.-Houston

[14th Dist.] Oct. 11, 2007, pet. denied) (mem.op.). In response to the First Motion, Love did not point out summary-judgment evidence raising a genuine issue of fact as to the essential elements attacked in this no-evidence motion. Therefore, the trial court did not err in granting the First Motion as to Love's claims. *See id.; Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 206–08 (Tex.2002). Accordingly, we overrule Love's second issue and affirm the trial court's judgment as to all of Love's claims.

### B. *Did the trial court err in failing to sustain various objections asserted by Transcontinental?*

■ In its second issue, Transcontinental argues that the trial court erred by failing to sustain objections that Transcontinental asserted in the trial court against the affidavit of Terry Lakner, which the Defendants filed in support of the Third Motion. In its fourth issue, Transcontinental asserts that the trial court erred by failing to sustain objections that Transcontinental asserted in the trial court against the Identigene Report and the Gahn Affidavit. The record does not contain any express ruling by the trial court on Transcontinental's evidentiary objections. The trial court's granting of the three summary-judgment motions is not an implicit ruling on Transcontinental's evidentiary objections. *See Dolcefino v. Randolph,* 19 S.W.3d 906, 926–27 (Tex.App.-Houston [14th Dist.] 2000, pet. denied). In sum, the trial court did not rule on Transcontinental's evidentiary objections, either expressly or implicitly, nor did Transcontinental object to any refusal by the trial court to rule on these objections. Therefore, Transcontinental failed to preserve error on its second and fourth issues. *See* TEX.R.APP. P. 33.1(a); *Choice v. Gibbs,* 222 S.W.3d 832, 838 (Tex.App.-Houston [14th

Dist.] 2007, no pet.). Accordingly, we overrule these issues.[1]

## C. *Did the trial court err in granting the First Motion as to Transcontinental's claims?*

In its first issue, Transcontinental argues that the trial court erred in granting the First Motion, in which the Defendants asserted that there is no evidence of duty, breach, or proximate cause with respect to the negligence claims and no evidence of the following elements with respect to the strict-products-liability claims:

- That Briggs designed, manufactured, marketed, or distributed the product;
- That Briggs placed the product into the stream of commerce;
- That the Lift was defectively designed so as to render it unreasonably dangerous;
- That there was a safer alternative design available;
- That the allegedly defective product was a producing cause of the alleged damages.

### 1. Is there a negligence duty?

In its summary-judgment response, Transcontinental submitted an affidavit of Michael Mardis, Jackson's cousin, in which Mardis testifies as follows:

- Mardis was employed at the Congregation as a maintenance man and was a witness to the accident in which Jackson was killed.
- Jackson was operating the Lift in the sanctuary to change the lights.
- The day before the accident, two men from Briggs came out to the Congregation and installed the Lift inside the

building, right outside the doors to the sanctuary.

- The two Briggs men would have seen the area where the Lift was going to be used.
- Briggs equipped the Lift with a straddle so that the Lift could be placed over the seats in the sanctuary to operate.
- "We believed that since the green lights were on, it was proper to operate the lift. During the particular lift which ended with the lift toppling with [Jackson] in it, the lift was in the straddle, the green lights were on and the lift went up. After the lift started to slowly tilt, [Jackson] said he was trying to bring the lift down, but that it wouldn't come down. As the lift was moving, we were trying to hold it from tipping over, but could not hold it. The lift tipped over, throwing him to the ground and resulting in his death. Another Congregation employee, Don Robinson, injured his arm from the lift falling over."

Transcontinental submitted an affidavit from its liability expert, Gary S. Nelson, in which Nelson testifies as follows:

- Briggs had a responsibility of ordinary care to adequately train its customers in the proper use and operation of the equipment provided for their use and explicitly warn their customers regarding potential safety hazards associated with such equipment. Regarding the Lift and Super Straddle at issue in this case, such warnings would include a warning to never operate the Lift when installed in the Super Strad-

---

1. Though Transcontinental has not preserved error as to the trial court's failure to sustain these evidentiary objections, this does not prevent Transcontinental from pointing out on appeal objections to summary-judgment evi-

dence that can be raised for the first time on appeal, for example that statements in the evidence are conclusory. *See Choice*, 222 S.W.3d at 838.

dle without all four outriggers installed in the straddle base.

- Briggs's responsibility to adequately train its customers is also based on "section 5.6 in ANSI A92.3, titled 'American National Standard for Manually Propelled Elevating Aerial Platforms.'"

Transcontinental's summary-judgment evidence also includes a transcript of an interview of Mardis in which Mardis states that, the day before the accident, a man working for Briggs had set up the Lift and Super Straddle outside of the sanctuary but that Congregation employees set up this equipment in the sanctuary on the day of the accident. There is also a report in which the following is stated:

- Bryan with Briggs assembled the Lift, and all the lights were on even though the outriggers were not installed.
- Without the outriggers installed, the Lift was not supposed to operate; however, it did operate without the outriggers being installed, and Bryan with Briggs "felt comfortable with this."
- Bryan with Briggs said that it was "okay" not to use the outriggers.

Transcontinental also submitted evidence showing that Briggs rented the Lift and Super Straddle to the Congregation on Lakey's account and delivered this equipment to the Congregation on the day before the accident. Transcontinental provided deposition testimony from Richard Curtin, a Product Safety Manager for Genie's parent company. Curtin testified as follows:

- Curtin is familiar with a Genie training guide that recites responsibilities based on "ANSI A92.3."
- That guide states that manufacturers of aerial platforms have the responsibility to provide the operational maintenance instructions with regard to aerial platforms.

- Manufacturers of aerial platforms have the responsibility to identify the hazards associated with operating the aerial platforms.
- The guide and the ANSI standard state that Dealers have the responsibility to offer appropriate training and familiarization to users and operators regarding all aspects of aerial-platform operation and safety.
- Owners of aerial platforms have the same responsibility.
- Genie provides training courses to rental companies such as Briggs so that Briggs can train its employees on how to train operators of the equipment.
- This training of the operators on how to use the Lift and Super Straddle includes a classroom component in which a videotape is played, a review of the operator's manual for the Lift and for the Super Straddle, a test at the end of the classroom session, hands-on training, including pre-operation inspection and a review of the functional testing of the equipment, a discussion of workplace inspections and safety, and a question-and-answer session.

Bobby Wilking, a regional sales manager for Genie, testified, among other things as follows:

- ANSI A92.3, section 5.6 states that, "Whenever a dealer directs or authorizes an individual to operate an aerial platform, the dealer shall ensure the individual has been trained under the direction of a qualified person in [accordance] with the manufacturer's operator and maintenance manual and requirements listed in Section 8 before operating the aerial platform."
- Briggs qualifies as a "dealer" under this standard.

- This standard requires that the dealer ensure that the individual has been trained under the direction of a qualified person.
- That is the industry standard as to the training that should be provided by the dealer.

In his report, Curtin states that Genie manufactured the Lift and Super Straddle involved in this accident and that Briggs owned and maintained this equipment.

The summary-judgment evidence contains a statement by William Purcell (Briggs's retained expert) that Briggs provided "hands-on" training to Congregation employees when the Lift and Super Straddle were delivered.

■ Under the applicable standard of review, we conclude that summary-judgment evidence raises fact issues as to the existence of facts and circumstances under which Briggs and Genie owe a negligence duty. *See Gonzales v. Caterpillar Tractor Co.*, 571 S.W.2d 867, 871–72 (Tex.1978) (holding that manufacturer has duty to exercise ordinary care in design, preparation, manufacture, and sale of product); *Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116, 119 (Tex.1976) (holding that one who voluntarily undertakes an affirmative course of action for the benefit of another has a duty to exercise reasonable care that the other's person will not be injured thereby); *Sico N. Am. v. Willis*, No. 14–08–00158–CV, 2009 WL 3365856, at *8 (Tex.App.-Houston [14th Dist.] Sept. 10, 2009, no pet.) (mem.op.) (addressing negligence duty owed by product manufacturer).

**2. Is there any evidence of breach of a negligence duty?**

The summary-judgment evidence contains the following opinions from Nelson:

- Genie failed to comply with the best practice as advocated by the safety literature for decades to interlock the hydraulic lift start mechanism so as not to operate without the installation and use of outriggers (including when utilized with the Super Straddle accessory). Compliance with such a design feature is especially warranted when potentially dangerous equipment will foreseeably be used by a "weekend" user, such as those who occasionally rent or lease such equipment, and who have little experience in the use of such equipment.
- When the Super Straddle was designed, manufactured, marketed, distributed, and sold, Genie knew or should have known of the readily available state-of-the-art safe design principles and guidelines that would have effectively eliminated the hazard associated with the use of the Lift without the outriggers installed in the straddle unit base, as dictated by the ordinary application of generally known design criteria, as well as the recommendations and provisions of the relevant authoritative safety literature.
- When the Super Straddle was designed, manufactured, marketed, distributed, and sold, Genie knew or should have known of various reasonably available, significantly safer alternative designs that would have prevented or significantly reduced the risk of the type of mishap or injury that occurred to Jackson and Robinson in this case and these alternative available designs would have been both economically and technically feasible without impairing the Super Straddle's utility.
- The primary unsafe condition or causative factor related to the incident in question was the lack of an electrical interlock system incorporated on the Genie Super Straddle unit to work in combination with the interlock system on the Lift, that would prevent the

operation of the Lift (raising the mast and personnel platform) without all four outriggers properly installed in the Super Straddle base.

- When the Lift is installed on the Super Straddle platform, the Lift is fully operational (enabled for raising the mast and attached personnel platform) whether or not the outriggers are installed on the straddle unit base. The mechanical interlock incorporated into the design of the Super Straddle unit only prevents the initial raising of the *straddle platform* if the outriggers are not installed. Once the straddle platform is raised past the mechanical block (only 1 to 2 inches), the straddle platform can then be raised the remainder of the height and moved around without the outriggers installed. However, at no time does the mechanical interlock prevent the operation of the Lift, allowing the mast and attached personnel platform to be raised at any time whether the outriggers are installed in the straddle base or not. Essentially, the mechanical interlock is useless in preventing the primary hazard associated with this equipment, which is the raising of the Lift's mast without the outriggers installed.
- Genie failed to design, manufacture, market, and distribute the Super Straddle to be free of recognized and reasonably foreseeable hazards likely to result in death or severe injury.
- Briggs failed to adequately train Jackson and Robinson in the proper use and operation of the Super Straddle and failed to warn them of the dangers of operating the Lift without all four outriggers installed in the straddle base.

The summary-judgment evidence contains a statement by William Purcell, an expert retained by Briggs, that Briggs provided "hands-on" training to Congregation employees when the Lift and Super Straddle were delivered.

■ Considering all the summary-judgment evidence in the light most favorable to Transcontinental, crediting evidence favorable to Transcontinental if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not, we conclude that reasonable and fair-minded jurors could differ in their conclusions as to whether Genie and Briggs breached their negligence duties. There is a genuine issue of fact as to the element of breach of negligence duty. *See Gonzales,* 571 S.W.2d at 871–72 (concluding there was fact issue in negligence claim against product manufacturer); *Sico N. Am.,* 2009 WL 3365856, at *8–10 (same).

### 3. Is there any evidence of causation regarding the negligence claims?

Mardis, Jackson's co-worker and cousin who witnessed the accident in which Jackson was killed, testified as follows:

- The day before the accident, two men from Briggs came out to the Congregation and installed the Lift inside the building, outside the doors to the sanctuary. Briggs equipped the Lift with a straddle so that the Lift could be placed over the seats in the sanctuary to operate.
- "We believed that since the green lights were on, it was proper to operate the lift. During the particular lift which ended with the lift toppling with [Jackson] in it, the lift was in the straddle, the green lights were on and the lift went up. After the lift started to slowly tilt, [Jackson] said he was trying to bring the lift down, but that it wouldn't come down. As the lift was moving, we were trying to hold it from tipping over, but could not hold it. The lift tipped over, throwing him to the ground and resulting in his death.

Another Congregation employee, Don Robinson, injured his arm from the lift falling over."

Nelson, Transcontinental's liability expert, testified as follows:

- Had outriggers been used on the Lift when the platform was raised above the floor level, it would not have become unstable and tipped over.
- When the Super Straddle was designed, manufactured, fabricated, marketed, distributed, and sold, Genie failed to comply with ordinary good practice and available design principles and guidelines, incorporated and in use on its own lift equipment, in addition to technology being used by its competitors on the same or similar equipment, pertaining to the prevention of the lift mast being raised without outriggers installed in the straddle base, which would have effectively minimized the tip-over hazard, and with a high degree of certainty, prevented the incident.
- When the Super Straddle was designed, manufactured, fabricated, marketed, distributed, and sold, Genie failed to use a reasonably available, economically and technically feasible, significantly safer, alternative design that would have prevented or significantly reduced the risk of the type of mishap and injury that occurred without impairing the Super Straddle's utility.

 The record contains a statement that, when the Lift and Super Straddle were delivered, an employee of Briggs said that it was "okay" not to use the outriggers. The record also contains evidence that the Congregation employees did not use outriggers and that their failure to do so caused the Lift to tip over resulting in Jackson's injuries and death and Robinson's injuries, which are the basis of Transcontinental's claims.

Under the applicable standard of review, we conclude that there are genuine fact issues as to the causation element of Transcontinental's negligence claims. *See Mott v. Red's Safe and Lock Servs., Inc.,* 249 S.W.3d 90, 96–97 (Tex.App.-Houston [1st Dist.] 2007, no pet.) (finding genuine fact issue as to causation element of negligence claim).

**4. Is there any evidence that Briggs placed the product in the stream of commerce?**

 In the First Motion, Briggs asserted there is no evidence that Briggs designed, manufactured, marketed, or distributed the product and no evidence that it placed the product in the stream of commerce. The text of section 402A of the Restatement (Second) of Torts suggests that strict products liability is limited to "sellers" who are "engaged in the business of selling such a product." *See* RESTATEMENT (SECOND) OF TORTS § 402A (1965); *New Tex. Auto Auction Servs. v. Gomez De Hernandez,* 249 S.W.3d 400, 403 (Tex. 2008). Texas courts, however, have long applied strict products liability more broadly. *See New Tex. Auto Auction Servs.,* 249 S.W.3d at 403. Lessors of products are subject to strict liability claims as long as they placed the product in question into the stream of commerce. *See id.; Rourke v. Garza,* 530 S.W.2d 794, 800 (Tex.1975), *abrogated on other grounds by, Ford Motor Co. v. Ledesma,* 242 S.W.3d 32, 45–46 (Tex.2007).

The summary-judgment evidence shows that Briggs rented the Lift and Super Straddle to the Congregation on Lakey's account and that Briggs delivered this equipment to the Congregation on the day before Jackson's fatal fall. Under the applicable standard of review, there is a genuine fact issue (1) as to whether Briggs designed, manufactured, marketed, or distributed the product and (2) as to whether

Briggs placed the Lift and Super Straddle in the stream of commerce. *See Rourke*, 530 S.W.2d at 800.

**5. Is there any evidence that the product was defectively designed so as to render it unreasonably dangerous and that a safer alternative design was available?**

 A strict-products-liability claimant alleging design defect must prove that the product was defectively designed so as to render it unreasonably dangerous. *See Timpte Indus. v. Gish*, 286 S.W.3d 306, 311 (Tex.2009). To make this determination, Texas courts apply a risk-utility analysis that requires consideration of the following factors:

> (1) the utility of the product to the user and to the public as a whole weighed against the gravity and likelihood of injury from its use; (2) the availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive; (3) the manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs; (4) the user's anticipated awareness of the dangers inherent in the product and their avoidability because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions; and (5) the expectations of the ordinary consumer.

*Id.* The risk-utility analysis does not operate in a vacuum, but rather in the context of the product's intended use and its intended users. *Id.* at 312. Although whether a product is defective is generally a question of fact, in the appropriate case, it may be determined as a matter of law. *Id.* Related to this element is the existence of a safer alternative design. *See* TEX. CIV. PRAC. & REM. Code Ann. § 82.005(a)(1) (Vernon 2005); *Timpte Indus.*, 286 S.W.3d at 311. In the First Motion, the Defen-dants asserted that there is no evidence (1) the product was defectively designed and unreasonably dangerous and (2) a safer alternative design was available.

 Nelson, Transcontinental's expert, testified that the Lift and Super Straddle were defective and unreasonably dangerous because they were not sold with an interlock incorporated into their design that would prevent the hydraulic personnel platform from being raised without the use of outriggers necessary to keep the Lift stable and prevent turnover. Nelson stated that the product was defective due to the lack of an electrical interlock system incorporated on the Super Straddle unit to work in combination with the interlock system on the Lift, that would prevent the operation of the Lift (raising the mast and personnel platform) without all four outriggers properly installed in the Super Straddle base. Nelson observed that, as designed, when the Lift is installed on the Super Straddle platform, the Lift is fully operational (enabled for raising the mast and attached personnel platform), even if the outriggers are not installed on the straddle unit base.

The mechanical interlock incorporated into the design of the Super Straddle unit only prevents the initial raising of the *straddle platform* if the outriggers are not installed. Once the straddle platform is raised past the mechanical block (only 1 to 2 inches), the straddle platform can then be raised the remainder of the height and moved around without the outriggers installed. However, at no time does the mechanical interlock prevent the operation of the Lift, allowing the mast and attached personnel platform to be raised at any time whether or not the outriggers are installed in the straddle base. In Nelson's opinion, the mechanical interlock is useless in preventing the primary hazard associated with this equipment, which is the rais-

ing of the Lift's mast without the outriggers installed.

According to Nelson, when the product in question was designed, manufactured, marketed, distributed, and sold, there were various reasonably available, significantly safer alternative designs that would have prevented or significantly reduced the risk of the type of mishap and injuries that Jackson and Robinson experienced, and these alternative available designs would have been both economically and technically feasible without impairing the Super Straddle's utility. Nelson concluded that when the Super Straddle was designed, Genie failed to comply with available design principles and guidelines used on its own lift equipment, in addition to technology being used by its competitors on the same or similar equipment, pertaining to the prevention of the Lift mast being raised without outriggers installed in the straddle base.

Nelson noted that the Lift has an electrical interlock system that, when no Super Straddle is being used, prevents the raising of the mast (and attached personnel platform) unless all four outriggers are properly installed. Nelson observed, however, that when the Lift is used with the Super Straddle, this electrical interlock system allows the mast and platform to be raised even if none of the outriggers are installed. Nelson faulted the product design for failing to physically safeguard the tip-over hazard by incorporating into the design of the Super Straddle the same type of electrical interlock system as used in the design of the Lift. Nelson stated that such an interlock system in the Super Straddle would then be "plugged into" the interlock system in the Lift, by socket plug or other means, thus preventing the operation of the Lift unless the four outriggers were properly installed in the straddle unit base. Nelson noted that he had inspected a "JLG 30AM AccessMaster Push–Around

Personnel Lift" and "JLG Straddle Extension" and that these products showed the incorporation of this type of system, which does not allow the Lift to be operated unless all outriggers are installed in the straddle base. Nelson concluded that the availability of such a system from a competing manufacturer shows the technical feasibility of incorporating such a design into Genie's products.

At his deposition, Curtin testified that the Lift has a panel of four green lights, one for each outrigger. As each outrigger is properly installed in the unit, the corresponding green light is activated. If all four green lights are not activated, then the personnel platform cannot be raised. However, Curtin testified that, if the outriggers are not being used and the Lift is connected to the Super Straddle, the green lights will be activated.

Considering all the summary-judgment evidence in the light most favorable to Transcontinental, crediting evidence favorable to Transcontinental if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not, we conclude that reasonable and fair-minded jurors could differ in their conclusions as to whether (1) the product was defectively designed so as to render it unreasonably dangerous and (2) a safer alternative design was available. A genuine issue of fact exists as to these elements. *See Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 588–92 (Tex.1999) (concluding there was fact issue as to existence of safer alternative design); *Gonzales*, 571 S.W.2d at 869–71 (concluding there was fact issue as to existence of design defect).

**6. Is there any evidence that the allegedly defective product was a producing cause of the alleged damages?**

The Defendants also asserted that there is no evidence that the allegedly defective product was a producing cause of

the alleged damages. A producing cause is a cause that was "a substantial factor in bringing about an injury, and without which the injury would not have occurred." *Ledesma*, 242 S.W.3d at 42.

Nelson, Transcontinental's liability expert, testified as follows:

- Had the Lift been equipped with an interlock incorporated into its design that would prevent it from being raised without the use of outriggers in the Super Straddle, with a high degree of engineering and scientific certainty, the Lift would not have tipped over, and Jackson would not have been injured.
- When the Super Straddle was designed, manufactured, marketed, distributed, and sold, Genie failed to comply with available design principles and guidelines, used on its own lift equipment, in addition to technology being used by its competitors on the same or similar equipment, pertaining to the prevention of the Lift mast being raised without outriggers installed in the straddle base, which would have effectively minimized the tip-over hazard, and with a high degree of certainty, prevented the incident.

Under the applicable standard of review, we conclude that there are genuine fact issues as to whether the allegedly defective product was a producing cause of the alleged damages. *See Shipley v. Holt Tex., Ltd.*, No. 2–09–122–CV, 2010 WL 1999016, at *5–6 (Tex.App.-Fort Worth May 20, 2010, no pet. h.) (mem.op.) (finding fact issue as to whether design defect was producing cause of personal injury); *Int'l. Harvester Co. v. Zavala*, 623 S.W.2d 699, 707 (Tex.Civ.App.-Houston [1st Dist.] 1981, writ ref'd n.r.e.) (finding fact issue as to whether design defect was producing cause of personal injury).

██ In the trial court, the Defendants asserted numerous objections against Transcontinental's summary-judgment evidence. On appeal, the Defendants devote most of their appellate briefing regarding the First Motion to their evidentiary objections. However, the record does not contain any express ruling by the trial court on Transcontinental's evidentiary objections. The trial court's granting of the three summary-judgment motions was not an implicit ruling on Transcontinental's evidentiary objections. *See Dolcefino*, 19 S.W.3d at 926–27. The trial court did not rule on any of the Defendants' evidentiary objections, either expressly or implicitly, nor did the Defendants object to any refusal by the trial court to rule on these objections. Therefore, the Defendants waived all of the objections to defects in form, as to which a trial court ruling is required. *See id.; Choice*, 222 S.W.3d at 838. Most of the objections that the Defendants urge in their appellate brief have been waived.

██ Conclusory statements cannot raise a fact issue, even if they drew no objection, and the summary-judgment evidence does contain some conclusory statements. Nonetheless, even ignoring all the conclusory statements and other summary-judgment evidence that has a defect in substance, the remaining evidence raises a genuine fact issue as to all elements challenged in the First Motion. Accordingly, we conclude that, as to Transcontinental, the trial court erred in granting the First Motion, and we sustain Transcontinental's first issue to that extent.

### D. *Did the trial court err in granting the Second Motion as to Transcontinental's claims?*

In its third issue, Transcontinental asserts that the trial court erred in granting the Second Motion. In that motion, Briggs asserted that it is a "seller" as defined in chapter 82 of the Texas Civil

Practice and Remedies Code, entitled "Products Liability." *See* TEX. CIV. PRAC. & REM.CODE ANN. § 82.001(1) (Vernon 2005) (defining a "seller" as "a person who is engaged in the business of distributing or otherwise placing, for any commercial purpose, in the stream of commerce for use or consumption a product or any component part thereof"). Briggs asserted that section 82.003 of the Texas Civil Practice and Remedies Code applies. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 82.003 (Vernon Supp. 2010). This provision, entitled "Liability of Nonmanufacturing Sellers," states in pertinent part:

(a) A seller that did not manufacture a product is not liable for harm caused to the claimant by that product unless the claimant proves:

. . .

(3) that the seller installed the product, or had the product installed, on another product and the claimant's harm resulted from the product's installation onto the assembled product;

(4) that:

(A) the seller exercised substantial control over the content of a warning or instruction that accompanied the product;

(B) the warning or instruction was inadequate; and

(C) the claimant's harm resulted from the inadequacy of the warning or instruction;

(5) that:

(A) the seller made an express factual representation about an aspect of the product;

(B) the representation was incorrect;

(C) the claimant relied on the representation in obtaining or using the product; and

(D) if the aspect of the product had been as represented, the claimant would not have been harmed by the product or would not have suffered the same degree of harm;

(6) that:

(A) the seller actually knew of a defect to the product at the time the seller supplied the product; and

(B) the claimant's harm resulted from the defect. . . .

*Id.* Asserting both traditional and no-evidence grounds, Briggs claimed that as a matter of law, no part of section 82.003(a) applies in this case and therefore Briggs is entitled to summary judgment. We presume for the sake of argument that the evidence attached to the Second Motion facially established Briggs's right to judgment as a matter of law, thus shifting the burden to Transcontinental to raise a genuine, material fact issue sufficient to defeat the traditional grounds in the Second Motion. We also presume for the sake of argument that, even though Briggs first must show that it is a "seller" to take advantage of section 82.003, Briggs nonetheless may assert no-evidence grounds as to whether any of the seven scenarios listed in section 82.003(a) apply in this case. On appeal, Transcontinental assigns error only as to the four subsections listed above, claiming that the summary-judgment evidence raises a fact issue as to these four situations.

■ As to subsection (a)(3), Mardis testified that the day before the accident, two men from Briggs came out to the Congregation and installed the Lift inside the Congregation's building, equipping the Lift with the Super Straddle. The summary-judgment evidence also includes a statement that according to Donald Robinson and David Warfield (both Congregation employees), the Lift and Super Straddle were delivered to the Congregation and assembled by Briggs. As discussed above, the record contains evidence that,

when the Lift was attached to the Super Straddle, the product was defective due to the lack of an electrical interlock system incorporated on the Genie Super Straddle unit to work in combination with the interlock system on the Lift that would prevent the operation of the Lift (raising the mast and personnel platform) without all four outriggers properly installed in the Super Straddle base. Under the applicable standard of review, we conclude that there are genuine fact issues as to whether Briggs installed the product (or had the product installed) on another product and the harm resulted from the product's installation onto the assembled product. Therefore, the trial court erred in granting the Second Motion as to subsection (a)(3) of section 82.003. *See* Tex. Civ. Prac. & Rem. Code Ann. § 82.003(a)(3).

■ As to subsection (a)(4), according to a report in the summary-judgment evidence, (1) a Briggs employee assembled the Lift; (2) without the outriggers installed, the Lift was not supposed to operate, but the Lift did operate without the outriggers being installed; and (3) the Briggs employee "felt comfortable with this" and said that it was "okay" not to use the outriggers. Under the applicable standard of review, we conclude that there are genuine fact issues as to whether (A) Briggs exercised substantial control over the content of a warning or instruction that accompanied the product; (B) the warning or instruction was inadequate; and (C) the claimant's harm resulted from the inadequacy of the warning or instruction. Therefore, the trial court erred in granting the Second Motion as to subsection (a)(4) of section 82.003. *See id.* § 82.003(a)(4).

■ As to subsection (a)(5), according to a report in the summary-judgment evidence, a Briggs employee assembled the Lift and told Congregation employees that it was "okay" not to use the outriggers. Under the applicable standard of review,

we conclude that there are genuine fact issues as to whether (A) Briggs made an express factual representation about an aspect of the product; (B) the representation was incorrect; (C) the claimant relied on the representation in obtaining or using the product; and (D) if the aspect of the product had been as represented, the claimant would not have been harmed by the product or would not have suffered the same degree of harm. Therefore, the trial court erred in granting the Second Motion as to subsection (a)(5) of section 82.003. *See id.* § 82.003(a)(5).

■ To satisfy subsection (a)(6), Transcontinental has to prove that Briggs actually knew of a defect to the product when Briggs supplied the product. The only evidence that Transcontinental cites as raising a fact issue in this regard is a statement by Nelson (Transcontinental's liability expert) that "through the prudent application of reasonable and competent care in the operation of their business [sic] to know the operational characteristics of the equipment that they rent or lease, and their obligation and practice to instruct persons unfamiliar with such equipment regarding its safe use, Briggs knew that the installation of the outrigger extension frame would, under reasonably foreseeable circumstances, bypass the outrigger interlock safety feature and allow the lift platform to be raised without the use of outriggers." Under the applicable standard of review, we conclude that there are no genuine fact issues as to whether Briggs actually knew of a defect to the product when Briggs supplied the product. Because the evidence does not raise a genuine fact issue in this regard, the trial court did not err in granting the Second Motion as to subsection (a)(6) of section 82.003. *See id.* § 82.003(a)(6). However, because fact issues exist as to the three subsections discussed above, Briggs was not entitled to judgment as a matter of law against

Transcontinental, and the trial court erred in granting the Second Motion.[2] Accordingly, we sustain the third issue as to Transcontinental's claims.

**E. *Should this court grant Transcontinental's unopposed motion to unseal the Identigene Report and the Gahn Affidavit?***

On its own motion and without following the procedures described in Texas Rule of Civil Procedure 76a, entitled "Sealing Court Records," the trial court ordered the Identigene Report to be submitted to the court under seal. *See* TEX.R. CIV. P. 76a (stating that "no court order or opinion issued in the adjudication of a case may be sealed. Other court records ... are presumed to be open to the general public and may be sealed only upon a showing of all of the following...."). Identigene submitted the Gahn Affidavit to the trial court under seal. Both documents remain under seal on appeal in this court. Transcontinental has filed a motion to unseal these documents. Neither the Defendants nor Love, the Child's mother, oppose this motion. Under these circumstances, we grant the motion and order the documents unsealed.

**F. *Did the trial court err in granting the Third Motion as to Transcontinental's claims?***

In its fifth issue, Transcontinental asserts that the trial court erred in granting the Third Motion. In that motion, the Defendants sought partial summary judgment, arguing the Child cannot recover under the wrongful-death statute because, as a matter of law, the Child is not Jackson's biological daughter. The Defendants sought this relief under a traditional ground based on the Identigene Report and under a no-evidence ground. We presume for the sake of this analysis that Love and Jackson were not married (either ceremonially or by common-law marriage).

▮ The parties also have raised an issue as to whether chapter 160 of the Texas Family Code (The Uniform Parentage Act) applies to the determination of whether an alleged wrongful-death beneficiary is the biological child of the decedent. *See* TEX. FAM.CODE ANN. § 160.001, et seq. (Vernon 2008). In *Garza v. Maverick Market, Inc.,* the Supreme Court of Texas held that a predecessor statute to chapter 160 did not apply to the determination of whether an alleged wrongful-death beneficiary is the biological child of the decedent. *See* 768 S.W.2d 273, 275 (Tex.1989). After examining the relevant text from the Family Code, the *Garza* court concluded that the Family Code procedures were intended for different purposes and were not designed or intended to apply in wrongful-death actions. *See id.* Though the Uniform Parentage Act is different in many ways from the predecessor statute in *Garza,* we see no language in chapter 160 that would justify a departure from the *Garza* holding or that would signal an intent by the legislature that chapter 160 apply in wrongful-death actions. *See* TEX. FAM.CODE ANN. § 160.001, *et seq.* Therefore, we hold that chapter 160 does not apply to the determination in this case of whether the Child is Jackson's biological daughter. *See id.; Cooper Tire & Rubber Co. v. Mendez,* 155 S.W.3d 382, 415 (Tex. App.-El Paso 2004) (applying *Garza* standard and not chapter 160 to determination of whether the child was decedent's biological daughter and therefore a beneficiary

---

**2.** The Defendants again argue various objections to form regarding Transcontinental's evidence in response to the Second Motion. As discussed above with respect to the First Mo-

tion, these objections have been waived. *See Choice,* 222 S.W.3d at 838; *Dolcefino,* 19 S.W.3d at 926–27.

under the wrongful-death statute), *rev'd on other grounds*, 204 S.W.3d 797 (Tex.2006).

Under *Garza*, to recover under the wrongful-death statute, the Child need not have been shown to be Jackson's daughter in a proceeding under another statute. *See Garza*, 768 S.W.2d at 275. If paternity is questioned in a wrongful-death action, the putative child of the decedent has the burden of proving a filial relationship with the decedent by clear and convincing evidence. *See id.* at 275–76. In making this determination, blood tests, if available, may help show the alleged father's paternity. *See id.* at 276. Evidence of physical resemblance of the child to the alleged father, either by photographs of the child and father, or by the offer of the child itself, is also admissible to determine paternity. *See id.* In addition, prior statements by the alleged father that he was the father of the child or other admissions by him bearing on his relationship to the child may be considered. *See id.* A trial court also can consider evidence of periods of conception and gestation. *See id.* Whether some or all of this evidence would rise to the level of clear and convincing evidence in a particular case cannot be predicted. *See id.*

As to the Defendants' traditional motion for summary judgment, we conclude that their motion and summary-judgment evidence did not facially establish their right to judgment as a matter of law. *See M.D. Anderson Hosp. & Tumor Inst.*, 28 S.W.3d at 23. The Third Motion was submitted to the trial court on August 27, 2007. The only timely filed evidence submitted by the Defendants is the one-page Identigene Report. Though this report states that Jackson is excluded as being the Child's biological father and that there is a 0% "Probability of Paternity" based on this testing, this report does not explain the nature of testing or how it was performed. In addition, the genetic testing was per-

formed more than four years after Jackson's death, and the Identigene Report does not explain any of the following: (1) the nature of the sample purportedly taken from Jackson, (2) the chain of custody of that sample, (3) any reasons to believe the sample really is from Jackson, (4) under what conditions the sample was maintained over the years since Jackson's death, and (5) whether the conditions in which the sample was kept might affect the results of the genetic testing. Indeed, as to Jackson's purported sample, the Identigene Report states that the collection date is "N/A" and the date Identigene received the sample was October 5, 2006, more than four years after Jackson's death. The Identigene Report does not facially establish the Defendants' right to judgment as a matter of law.

Attempting to address some of these issues, the Defendants attached to their summary-judgment reply (1) an affidavit from a toxicologist at the Harris County Medical Examiner's Office regarding the taking of blood samples from Jackson's body during the autopsy and the custody of these samples and (2) an affidavit from another person at the Harris County Medical Examiner's Office regarding the preparation of a blood card that was given to Identigene for testing. In addition, Identigene filed the Gahn Affidavit under seal with the trial court. However, all of this evidence was filed in October 2006, more than a month after the submission date for the Third Motion. This submission date was not reset, and the trial court never granted leave for the Defendants to file late summary-judgment evidence. Therefore, we cannot consider these three late-filed affidavits on appeal. *See* TEX.R. CIV. P. 166a(c); *Benchmark Bank v. Crowder*, 919 S.W.2d 657, 663 (Tex.1996).

As to the no-evidence ground, Transcontinental submitted the following evidence:

- At a hearing before the Texas Workers' Compensation Commission, Love testified that (1) she lived with Jackson; (2) she was Jackson's common-law wife; (3) Jackson is the Child's father; (4) Jackson made representations to various friends and her doctor that Jackson was the Child's father; (5) Love tried to list Jackson as the father on the Child's birth certificate but could not do so because his signature is required to list him on the birth certificate and he died before the Child was born; and (6) there is nobody else who could be the father of the Child.[3]

- An affidavit from Mardis, in which he states that (1) Jackson had talked for weeks before his death above the impending birth of his baby; (2) Jackson had been approved to take off work the day of the expected delivery so that he could be at the hospital for the birth; (3) Jackson told "everybody" that he and Love were expecting a baby.

- Statements from two people that Jackson told them that Jackson was the father of Love's baby.

Considering all the summary-judgment evidence in the light most favorable to Transcontinental, crediting evidence favorable to Transcontinental if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not, we conclude that a reasonable and fair-minded juror could form a firm belief or conviction that Jackson was the biological father of the Child. *See Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625–27 (Tex. 2004) (setting out general standard of review for legal-sufficiency issues involving clear-and-convincing burden of proof); *Garza*, 768 S.W.2d at 276 (holding that there was a fact issue as to whether decedent was the father of a child born after the decedent's death, in wrongful-death case). Because the evidence raises a genuine fact issue in this regard, the Defendants were not entitled to judgment as a matter of law against Transcontinental, and the trial court erred in granting the Third Motion.[4] We sustain the fifth issue as to Transcontinental's claims.

## V. CONCLUSION

Because Love did not file a response in opposition to the First Motion, the trial court did not err in granting summary judgment as to Love's claims. All of the objections to form asserted against the summary-judgment evidence were waived when the parties failed to obtain a ruling on the objections in the trial court. Genuine fact issues exist as to all of the no-evidence elements attacked in the First Motion and as to three of the subsections of section 82.003(a) of the Texas Civil Practice and Remedies Code, precluding summary judgment based on the Second Motion. A genuine issue of material fact precludes summary judgment as to whether Jackson was the father of the Child. The trial court erred in granting all of the summary-judgment motions as to Transcontinental.[5]

3. We presume for the purposes of our analysis that the determination by the Texas Workers' Compensation Commission that Jackson is the Child's father is not binding on the Defendants in this case.

4. The Defendants again argue objections to form regarding Transcontinental's evidence in response to the Third Motion. As discussed above in connection with the First Motion,

these objections have been waived. *See Choice*, 222 S.W.3d at 838; *Dolcefino*, 19 S.W.3d at 926–27.

5. Even though the record reflects that, technically, the trial court granted summary judgment more than ten months after "trial" began, no significant trial proceedings had begun, and, in any event, trial courts can

Accordingly, we affirm the trial court's judgment as to all of Love's claims, reverse the judgment as to all of Transcontinental's claims, and remand Transcontinental's claims for further proceedings consistent with this opinion.

grant summary judgment during trial. *See Sandhu v. Pinglia Invests. of Tex.*, No. 14–08–00184–CV, 2009 WL 1795032, at *2 (Tex. App.-Houston [14th Dist.] June 25, 2009, pet. denied) (mem.op.).