**Opinion issued April 24, 2025**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-23-00245-CV

_____

**JOHNNIE MELTON AND SHELLEY MELTON, Appellants**

**V.**

**BIG CREEK CONSTRUCTION, LTD. AND WFMM, LLC, Appellees**

---

**On Appeal from the 82nd District Court**
**Falls County, Texas[1]**
**Trial Court Case No. CV40970**

---

**MEMORANDUM OPINION**

---

[1] Pursuant to its docket equalization authority, the Supreme Court of Texas transferred this appeal to this Court. *See* Misc. Docket No. 23–9017 (Tex. Mar. 21, 2023); *see also* TEX. GOV'T CODE ANN. § 73.001 (authorizing transfer of cases); TEX. R. APP. P. 41.3 ("In cases transferred by the Supreme Court from one court of appeals to another, the court of appeals to which the case is transferred must decide the case in accordance with the precedent of the transferor court . . . .").

Appellants, Johnnie and Shelley Melton (collectively, the "Meltons"), challenge the trial court's rendition of summary judgment in favor of appellees, Big Creek Construction, Ltd. ("Big Creek") and WFMM, LLC ("WFMM"), in the Meltons' suit against Big Creek and WFMM for negligence. In five issues, the Meltons contend that the trial court erred in granting Big Creek and WFMM summary judgment and denying the Meltons' second motion for leave.

We affirm.

## Background

In their second amended petition, the Meltons alleged that on November 8, 2020, Tomas Treto-Trinidad ("Trinidad"), an employee of Big Creek, severely injured Johnnie in a vehicle collision. According to the Meltons, Trinidad, while driving a Dodge RAM pickup truck with a trailer attached, "negligently cross[ed] the centerline of Highway 77, at or near Big Creek Bridge," in Falls County, Texas and struck Johnnie's pickup truck "head-on." "The force of the collision caused [Johnnie's truck] to slide counterclockwise and roll several times" before "strik[ing] the concrete guardrail with the left side" of the truck. Johnnie's pickup truck "eventually . . . rest[ed] facing northeast in the northbound lane of travel and shoulder." Trinidad was pronounced dead at the scene of the vehicle collision, and the Meltons allegedly suffered "property damage, bodily injuries, and horrific damages."

2

The Meltons further alleged that at the time of the vehicle collision, Trinidad was employed by Big Creek and on his way to Giddings, Texas "to a Super 8 motel room purchased by Big Creek and its general partner," WFMM, "to further Trinidad's employment for Big Creek, and to benefit the general partnership between Big Creek and WFMM in performance of [a] contract between the Texas Department of Transportation and WFMM." According to the Meltons, Trinidad's father, David G. Treto ("Treto"), who was also an employee of Big Creek, owned the Dodge RAM pickup truck that Trinidad was driving at the time of the vehicle collision, and Big Creek-owned the trailer which Trinidad was pulling at the time of the collision.

The Meltons brought direct liability claims against Big Creek and WFMM for negligence, negligent entrustment, negligent supervision or control, and negligent training. The Meltons also brought a claim for vicarious liability against Big Creek and WFMM based on the purported negligent acts of Trinidad.[2]

As to damages, the Meltons sought reasonable past and future medical expenses, past and future physical pain and suffering, past and future physical impairment, loss of past and future earnings, loss of past and future household services, loss of consortium, mental anguish, and disfigurement.

---

[2]     The Meltons alleged negligence claims against Treto, Trinidad's father as well. Those claims are not at issue in this appeal.

3

Big Creek and WFMM answered,[3] generally denying the allegations in the Meltons' petition and asserting certain affirmative defenses. In their answers, Big Creek and WFMM also asserted that Trinidad was not acting in the course and scope of his employment with Big Creek at the time of the vehicle collision. Trinidad was not "on a special mission directed by WFMM or Big Creek nor was he furthering the business interests of WFMM or Big Creek with WFMM's or Big Creek's authority when the [vehicle collision] occurred." Additionally, Big Creek and WFMM asserted that Trinidad was not authorized to pull a Big Creek trailer with his personal pickup truck, they "owed no legal duty to" the Meltons, and they were not liable to the Meltons in the capacities in which they had been sued.

Big Creek and WFMM then moved for summary judgment on the Meltons' negligence claims against them, asserting that they were entitled to judgment as a matter of law and there was no evidence that Big Creek and WFMM owed a duty to the Meltons.[4] In their motion for summary judgment, Big Creek and WFMM explained that Trinidad was employed by Big Creek as a foreman of an asphalt crew. WFMM was the general partner of Big Creek, but had no relationship with Trinidad and did not employ him.

---

[3]     Big Creek and WFMM filed separate answers.

[4]     Big Creek and WFMM filed a motion for summary judgment and then a supplement to their summary-judgment motion. We discuss together the motion, the supplement, and the evidence attached to both.

4

Trinidad was assigned to "the State Highway 304 Bastrop job[site] near Giddings." Trinidad's asphalt crew had completed their work at a Giddings jobsite and moved their equipment to the Bastrop jobsite on Friday, November 6, 2020. After work on November 6, 2020, the asphalt crew members had the option of going home for the weekend. The asphalt crew members would be staying at a Super 8 motel in Giddings the following week while working at the Bastrop jobsite.

All activities between the end of the workday on Friday, November 6, 2020 and the start of the workday the following Monday were on personal time for the asphalt crew members. After work on November 6, 2020, Trinidad drove to Waco, Texas in a personal pickup truck for the weekend to spend time with his family. Trinidad was not to resume work until Monday, November 9, 2020. The asphalt crew members were not compensated for commuting back to the jobsite if they went home for the weekend and no mileage associated with such was reimbursed. Pay for the asphalt crew members would begin again on Monday, November 9, 2020 when work commenced.

According to Trinidad's sister, Brenda Treto-Murillo ("Murillo"), Trinidad parked a Big Creek-owned trailer at her home in Waco on Friday, November 6, 2020. Trinidad stayed at Murillo's home that weekend to visit his family. The Big Creek trailer remained at Murillo's home until about 3:00 p.m. on Sunday, November 8,

2020, when Trinidad left Murillo's home driving his personal pickup truck and pulling the Big Creek trailer.

At approximately 3:58 p.m. on November 8, 2020, Trinidad used "a Big Creek fuel card" at a gas station to fill up his personal pickup truck. This was against Big Creek policy; Big Creek fuel cards were not to be used for a personal vehicle. Around 4:20 p.m., Trinidad was involved in a vehicle collision with Johnnie on Highway 77 in Falls County. While driving, Trinidad was intoxicated and "crossed over the center line of Highway 77 into [Johnnie's] lane of travel and struck [Johnnie's pickup truck] head-on." At the time of the vehicle collision, Trinidad was pulling a Big Creek-owned trailer with his personal pickup truck. It was against Big Creek policy for an employee to pull a Big Creek trailer with his personal pickup truck.

Big Creek and WFMM further explained that Big Creek "had a strict no drinking and driving policy," and Big Creek did not know of Trinidad's drinking or intoxication on Sunday, November 8, 2020. Big Creek also had no knowledge of Trinidad's travel plans on November 8, 2020, and Big Creek "did not mandate any [employee's] driving routes or the manner of travel back to the [Super 8 motel] or to the jobsite after weekend travel."

According to Big Creek and WFMM, Trinidad, as an asphalt foreman, had "no authority to hire or fire employees or to remove Big Creek's property from a

6

jobsite without the permission of [Big Creek] management or his supervisor." Typically, at the end of a work week, Big Creek's trailers were locked and secured at jobsites. Big Creek also had a storage yard in Giddings where trailers could be locked and secured over a weekend. The asphalt crew members were not allowed to take home tools from their jobsite or trailers. There was no "business reason" for Trinidad to remove a Big Creek trailer from the Bastrop jobsite and take it to Waco with him for the weekend.[5] Further, Big Creek did not authorize Trinidad to take a trailer to Waco over the weekend, and Kent Dalsing, Trinidad's immediate supervisor, did not know that Trinidad had removed a trailer from the jobsite until after the vehicle collision. Trinidad violated Big Creek policy by removing a trailer from the jobsite and by pulling a Big Creek trailer behind his personal pickup truck.

Additionally, Big Creek and WFMM explained that Big Creek "provided motel accommodations [in Giddings] for employees working out of town," but Big Creek did not direct Trinidad to travel to the Super 8 motel on November 8, 2020. And Big Creek had no knowledge that Trinidad was driving to the motel on Sunday, November 8, 2020. Trinidad did not receive compensation from Big Creek for the

---

[5] Trinidad would not be going to Big Creek's "Lorena plant for supplies" during the weekend. And Big Creek mandated that employees could only use personal vehicles for company business if it was authorized by management "via a Vehicle Agreement." Trinidad was not "participating in th[e] Vehicle Agreement program, so he was not authorized to use" his personal pickup truck to pull a Big Creek trailer.

7

time he spent driving to and from work, and he was "not being compensated or reimbursed for mileage at the time" of the vehicle collision.

Big Creek and WFMM argued that they were entitled to judgment as a matter of law on the Meltons' negligence claims against them because they owed no legal duty to the Meltons. According to Big Creek and WFMM, Trinidad was not acting in the course and scope of his employment at the time of the vehicle collision under the "coming and going rule" and the Meltons could not establish any exceptions to the "coming and going rule."[6] (Internal quotations omitted.) Specifically, Trinidad allegedly caused a vehicle collision while driving on a public road during non-work hours traveling back to a jobsite after a weekend off, and the summary-judgment evidence established that the vehicle collision had nothing to do with Trinidad performing work in furtherance of Big Creek's business. The fact that Trinidad was pulling a Big Creek trailer with his personal pickup truck at the time of the vehicle collision did not negate the application of the "coming and going rule" nor did the fact that Trinidad used a Big Creek fuel card to put gas in his personal pickup truck on Sunday, November 8, 2020.

---

[6] Big Creek and WFMM asserted that the "special mission exception" to the "coming and going rule" did not apply. (Internal quotations omitted.) Trinidad's actions were not for "the business benefit" of Big Creek, and Trinidad's actions in taking the trailer to Waco over the weekend and pulling it with his personal pickup truck were prohibited by Big Creek policy.

Further, Big Creek and WFMM asserted that an employer is generally under no duty to control the off-duty conduct of an employee. And Big Creek did not know, or have reason to anticipate, that Trinidad would consume alcohol to the point of intoxication and cause the vehicle collision with Johnnie on Sunday, November 8, 2020. Simply put, Big Creek, Trinidad's employer, and WFMM, the general partner of Trinidad's employer, had no duty to "police the off-duty weekend conduct of employees, particularly when they [had been] drinking without the knowledge of the[ir] employer."[7]

Big Creek attached to its summary-judgment motion the affidavit of Dalsing, a general superintendent employed by Big Creek. In his affidavit, Dalsing testified that Trinidad was employed by Big Creek as an asphalt superintendent or foreman of an asphalt crew.[8] As an asphalt superintendent, Trinidad had "no authority to hire or fire employees or to remove Big Creek's property from [a] jobsite without the permission of [the] company manager" or Dalsing. Trinidad reported to Dalsing, and Dalsing was responsible for "directing the work of [Trinidad] and his asphalt crew in November 2020." Trinidad was assigned to the "State Highway 304 Bastrop job[site] near Giddings . . . as of November 6, 2020."

---

[7] Big Creek and WFMM also raised "no evidence points as to key issues relating to [its] no duty argument[]."

[8] Dalsing noted that Trinidad was not an employee of WFMM and had no relationship with WFMM. Dalsing also had no employment relationship with WFMM.

Dalsing further testified that Trinidad "last worked for Big Creek on Friday, November 6, 2020." The last text message correspondence Dalsing had with Trinidad was on the morning of Friday, November 6, 2020. Trinidad and his asphalt crew had the weekend off work, and he was not due back on the job until the morning of Monday, November 9, 2020. Trinidad's job would not have resumed, and he would not have been compensated by Big Creek, until November 9, 2020 "when his [asphalt] crew resumed work on the Bastrop job[site]." Although Trinidad could have driven a Big Creek-owned pickup truck over the weekend, Trinidad chose to drive a personal pickup truck to Waco.

According to Dalsing, at approximately 3:58 p.m., on Sunday, November 8, 2020, Trinidad "gassed up a vehicle and used a Big Creek fuel card" at the gas station. Trinidad's personal pickup truck was not a Big Creek vehicle, and Trinidad violated Big Creek policy if he filled up his personal pickup truck using the Big Creek fuel card.[9]

Dalsing further testified that Big Creek "strictly prohibit[ed] employees from drinking and driving." Dalsing had "no knowledge of [Trinidad's] drinking (let alone his intoxication) on Sunday, November 8, 2020, and [he] exercised no control

---

[9] Big Creek and WFMM attached a copy of Big Creek's policies to Dalsing's affidavit. Big Creek and WFMM also attached a copy of Big Creek's "Driver Fuel Policy," which stated that a Big Creek fuel card was not allowed to be used for filling up personal vehicles with gas. Trinidad signed the "Driver Fuel Policy."

10

over [Trinidad's] activities on the day of the [vehicle collision]." Dalsing noted that Trinidad was "free to drive to the jobsite on Monday or to spend Sunday night at the Super 8 [m]otel in Giddings." Dalsing did not direct Trinidad to travel to Giddings on November 8, 2020, and he had no knowledge of Trinidad's travel plans or route on November 8, 2020.

As to the trailer that Trinidad was pulling with his personal pickup truck on November 8, 2020, Dalsing testified that typically, at the end of a work week, trailers were locked and secured at a jobsite. Alternatively, Big Creek had a storage yard in Giddings where trailers could be secured over a weekend. Dalsing was unaware of any "business reason why [Trinidad] would [have] remove[d] [a] trailer from the [Bastrop] jobsite" on November 6, 2020 and taken it to Waco with him. Any supplies needed by Trinidad and his asphalt crew were transported to him on an as-needed basis. Trinidad did not pick up any supplies with the Big Creek-owned trailer over the weekend.

According to Dalsing, he did not know that Trinidad had removed a Big Creek trailer from the Bastrop jobsite on November 6, 2020, and Trinidad violated Big Creek policy by removing the trailer. Dalsing had not directed Trinidad to return the trailer to the jobsite because Dalsing was not aware that it had been removed.

Dalsing also explained that Trinidad did not receive any compensation from Big Creek for the time he spent driving to and from his jobsite, and Trinidad was not

11

being compensated or reimbursed for mileage at the time of the vehicle collision on November 8, 2020. Although Big Creek provided motel accommodations for employees working out of town and Trinidad could have stayed at the Super 8 motel in Giddings, Big Creek did not direct or require Trinidad to travel there on November 8, 2020. Dalsing did not know that Trinidad was driving to the motel at the time of the vehicle collision.

Big Creek and WFMM also attached the affidavit of Leonard Vaughan to their summary-judgment motion. In his affidavit, Vaughan testified that he was an accident reconstruction expert, and he had been asked to reconstruct the vehicle collision between Trinidad and Johnnie.

According to Vaughan, the vehicle collision occurred on November 8, 2020 at 4:20 p.m. Trinidad was driving a 2018 Dodge RAM pickup truck, which was registered to his father, Treto. Trinidad was pulling a 2019 "white box trailer" owned by Big Creek. Trinidad was traveling southbound on Highway 77 south of Waco, while Johnnie was driving a 2020 Ford F350 pickup truck northbound on Highway 77. While driving, Trinidad crossed the center line and collided head-on with Johnnie's pickup truck. Trinidad had a blood-alcohol concentration of 0.15. In Vaughan's opinion, the Big Creek trailer that Trinidad was pulling did not contribute to the vehicle collision.

12

Additionally, Big Creek and WFMM attached to their summary-judgment motion excerpts from the deposition testimony of Treto, Trinidad's father. Treto testified that Trinidad's job position with Big Creek was foreman. The pickup truck that Trinidad was driving on November 8, 2020 was under Treto's name, but it was Trinidad's personal pickup truck. Trinidad was "paying for it." Trinidad would drive his personal pickup truck "all his hours when he was off of work." According to Treto, Big Creek-owned the trailer that Trinidad was pulling at the time of the vehicle collision. Trinidad was not taking the trailer to a jobsite though; he was bringing it to his motel. Treto did not know if Trinidad was allowed to take the trailer off the jobsite, and according to Treto, sometimes the trailers stayed at the jobsite.

Treto also testified that Trinidad was not permitted to use a Big Creek-owned pickup truck for personal use, and Big Creek did not allow employees to use their fuel card when putting gas in their personal vehicle. Trinidad was in Waco to visit his family, and the Big Creek trailer was parked in Trinidad's sister's driveway for the weekend. Treto did not know if Trinidad was allowed to pull the Big Creek-owned trailer on the weekend of the vehicle collision.

Big Creek and WFMM attached to their supplement to their summary-judgment motion excerpts from the deposition testimony of Ricardo Martinez, a machine operator for Big Creek. In his deposition, Martinez testified

13

that as a machine operator he "place[d] down asphalt" and was a member of a "road crew." Big Creek sometimes paid for a motel room for Martinez if he was working at a jobsite too far from home.

While working for Big Creek, Martinez did not bring home tools from the jobsite. He also never brought a Big Creek trailer home with him. Instead, the trailers could be taken to "a small yard" or left on "the side of the road." Martinez, who sometimes pulled trailers from a completed jobsite to a new jobsite, never towed a Big Creek trailer with his personal vehicle. It was only appropriate for Martinez to drive his personal vehicle from his home to a jobsite and then back home; his personal vehicle was never used for work because that was prohibited.

In November 2020, Martinez was working as a machine operator. His crew's first day at the Bastrop jobsite was on Friday, November 6, 2020. Before starting at the Bastrop jobsite, Martinez was working at the Giddings jobsite, where he had worked from June 2020 until November 5, 2020. At the Giddings jobsite, Trinidad was the crew's foreman or supervisor. After work on Friday, November 6, 2020, Martinez drove him to Mexia, Texas. Big Creek did not reimburse him for mileage when he was driving his personal vehicle.

On Sunday, November 8, 2020, Martinez's asphalt crew was not working because they did not work on Sundays. Friday, November 6, 2020 was the crew's last day of work. On November 8, 2020, Martinez drove to Giddings to check into

14

the Super 8 motel so that he would be ready to start work on Monday morning. Martinez was not paid for his travel time to the Super 8 motel; Big Creek only paid for his motel room. Martinez received no compensation from Big Creek until he arrived at the jobsite on Monday, November 9, 2020. Members of Martinez's asphalt crew were not required by Big Creek to stay at the motel on Sunday, November 8, 2020; he also had the option of driving from home directly to the jobsite on Monday morning.

Martinez further noted that while his crew worked at the Giddings jobsite, Trinidad would return the Big Creek trailer to "the yard," which was fenced and able to be locked. "[T]he yard" in Giddings was available to store trailers while the asphalt crew worked at both the Giddings and Bastrop jobsites. According to Martinez, a specific trailer was assigned to his crew. On Friday, November 6, 2020, when Trinidad left the Bastrop jobsite, he said, "Alright, fellas, we'll see you Monday," and drove away pulling the Big Creek trailer with his personal pickup truck. (Internal quotations omitted.) At the time, Martinez did not know if Trinidad took the Big Creek trailer to Waco or to "the yard in Giddings" where he could leave it secured. Martinez had never seen Trinidad take a Big Creek trailer home with him on the weekends.

Further, according to Martinez, Trinidad never went "to the Lorena plant to replenish or get new supplies" on a weekend. Instead, during the week, Trinidad

15

would send someone if he needed new material or supplies. Martinez did not know of any business reason why Trinidad would pull the Big Creek trailer to Waco for the weekend.

Martinez also stated that he never took a Big Creek trailer from a jobsite with his personal vehicle. He also never took a Big Creek trailer home from a jobsite using a Big Creek vehicle. Martinez was not allowed to use a Big Creek fuel card to put gas in his personal vehicle, and it was inappropriate to remove a fuel card from a Big Creek vehicle because each card was assigned to a specific Big Creek vehicle. Martinez did not know if Trinidad had been authorized to pull a Big Creek trailer with his personal pickup truck.

Martinez testified that Big Creek had "rules about drinking and driving." It was not acceptable for an employee to drive a Big Creek vehicle or pull a Big Creek trailer if an employee had been drinking alcohol.

Big Creek and WFMM also attached to their supplement to their summary-judgment motion the affidavit of Chris Wolfe, the chief financial officer of Big Creek. In his affidavit, Wolfe testified that Big Creek's road crews, including "paving crews," were assigned to jobsites "as their base of operations." Road crews were not based out of any of Big Creek's office locations.

Wolfe also testified that Big Creek's records showed that at the time of the vehicle collision, Trinidad was a foreman of a paving crew that had been assigned

16

to a jobsite in Bastrop. Previously, Trinidad's crew had been assigned to a jobsite near Giddings, but on Friday, November 6, 2020, the crew moved equipment to the Bastrop jobsite "to be ready to start that part of the job on the [coming] Monday." Trinidad and his crew were allowed to stay at a motel in Giddings while working at both the Giddings and Bastrop jobsites, but Big Creek did not require Trinidad or his crew members to stay at a motel on the Sunday night prior to work beginning on Monday.

According to Wolfe, neither Trinidad nor his crew members were compensated for the time they spent commuting from where they had spent the weekend to Giddings on Sunday, November 8, 2020 or to Bastrop on Monday, November 9, 2020. Compensable hours for Trinidad and his crew began on Monday morning when work commenced at the Bastrop jobsite. Although Trinidad was guaranteed "60 hours of pay each week as a foreman, his commute time to and from [a] jobsite[] was not included in calculating his hours." "All activities between the end of the workday on Friday and the start of the new [work] day on Monday [were] personal time" for Trinidad and his crew. Big Creek did not "mandate any worker's driving route[] or the manner of travel back to the [m]otel or to the jobsite after weekend travel." Big Creek did not reimburse its employees, including a foreman of a road crew, for any expenses, such as mileage or gas, in commuting to a jobsite

17

in a personal vehicle, unless Big Creek and the employee had "a Vehicle Agreement."

Wolfe further explained that Big Creek's equipment, including trailers, were assigned to Big Creek road crews, as necessary, so that they could perform their road construction activities. A work trailer was used by Trinidad's crew, and Big Creek provided a locked and fenced location near Giddings where the trailer could be stored when it was not in use at either the Giddings or Bastrop jobsite. The assigned trailer could also have been "parked [at the jobsite] with machinery protecting it from being stolen." Trinidad had not been "contractually obligated, compensated, or requested by Big Creek to protect or safeguard [his crew's] trailer over a weekend between work weeks."

Additionally, a Big Creek pickup truck had been assigned to Trinidad's crew for Trinidad's use. At the time of the vehicle collision, Trinidad's assigned Big Creek pickup truck was "in the shop for mechanical repairs." While that pickup truck was being repaired, additional Big Creek pickup trucks were available for use by Trinidad.

Although certain Big Creek supervisors and foremen were authorized to drive personal vehicles on Big Creek jobsites and for Big Creek company business, none of them could do so without signing a "Vehicle Agreement." Foremen, like Trinidad, who had been authorized to drive a Big Creek vehicle were not allowed to

18

participate in the "Vehicle Agreement program." At the time of his death, Trinidad was not participating in the "Vehicle Agreement program" and was not authorized to use his personal pickup truck for Big Creek business.

Wolfe further testified that he had not found any Big Creek record that showed that Trinidad was allowed to remove the Big Creek trailer assigned to his crew from the Bastrop and Giddings area and pull it to Waco over the weekend. The removal of Big Creek equipment, like a Big Creek trailer, from a jobsite required management approval. There was no record showing that management had approved Trinidad removing the Big Creek trailer from the jobsite in the Bastrop and Giddings area over the weekend when the vehicle collision occurred. There was also no record indicating that there was a business purpose for removing the trailer from the Bastrop and Giddings area. Big Creek policy prohibited employees, like Trinidad, from pulling Big Creek trailers with their personal vehicles, unless the personal vehicle was the subject of a "Vehicle Agreement," which Trinidad's personal pickup truck was not.

Finally, Big Creek and WFMM attached to their supplement to their summary-judgment motion excerpts from the deposition testimony of Murillo, Trinidad's sister. In her deposition, Murillo testified that she first saw Trinidad on the night of Friday, November 6, 2020 at their parents' home. Trinidad was driving his personal pickup truck, pulling a trailer, and was coming from work. Murillo

knew that Trinidad had come straight from where he had been working to their parents' house.

Trinidad had dinner at their parents' house, and then, Trinidad and Murillo drove separately to her house. Trinidad parked his personal pickup truck and the trailer in Murillo's driveway. Murillo noted that Trinidad kept personal equipment and Big Creek equipment in the trailer, and he liked to organize it. There was no fence around Murillo's driveway area and no way to lock the area. Murillo did not know if Trinidad was allowed to take the Big Creek trailer off the jobsite.

Trinidad stayed at Murillo's home all weekend.[10] On Saturday, Trinidad unhooked his personal pickup truck from the trailer and went to the grocery store. This was the only time that Trinidad left Murillo's home that weekend. The trailer stayed parked at Murillo's home until about 3:00 p.m. on Sunday, November 8, 2020, when Trinidad left. Trinidad never took the trailer anywhere the entire weekend.

According to Murillo, Trinidad left on Sunday to go to the motel in Giddings "to get ready for Monday." In general, at the end of a weekend, Trinidad would either leave Sunday afternoon or at 4:00 a.m. on Monday morning. It depended on

---

[10]     Murillo noted that on Saturday, November 7, 2020, her parents came to her house and she and Trinidad hung out outside with them; it was just a normal family gathering.

20

how he felt. On Sunday, November 8, 2020, Trinidad "was not working that day."[11] He was simply commuting to the motel.

In response to Big Creek and WFMM's summary-judgment motion and supplement, the Meltons filed their third amended petition. Their third amended petition largely mirrored their second amended petition but included additional details related to their negligence claims against Big Creek and WFMM. For instance, the Meltons alleged that at the time of the vehicle collision Trinidad was employed by WFMM's general partner, Big Creek, and was pulling Big Creek's trailer "in furtherance of his employment with Big Creek to Giddings . . . to a Super 8 motel room purchased by Big Creek and its general partner WFMM to further Trinidad's employment for Big Creek and to benefit the general partnership between Big Creek and WFMM."

The Meltons again brought direct liability claims against Big Creek and WFMM for negligence, negligent entrustment, negligent supervision or control, and negligent training, and they added a direct liability claim against Big Creek and WFMM for gross negligence. The Meltons also continued to bring a claim for vicarious liability against Big Creek and WFMM based on the purported negligent acts of Trinidad.

---

[11]    Murillo testified that her husband worked for Big Creek for seven years and he never worked on a Sunday.

21

As to their direct liability claims, the Meltons asserted that Big Creek and WFMM were liable for the damages suffered by the Meltons "at the hands of Trinidad."[12] According to the Meltons, Big Creek and WFMM owed a duty to exercise ordinary care "to be certain that Big Creek's employee[,] Trinidad[,] was properly licensed" and "properly trained to operate WFMM and its general partner Big Creek's trailer," including "pull[ing] [the] trailer from job[site] to job[site] or wherever Trinidad . . . believed it was necessary for the . . . trailer to be." Big Creek and WFMM further had a duty to exercise ordinary care to be certain that Trinidad "could and would operate WFMM and its general partner Big Creek's . . . trailer reasonably and prudently before entrusting Trinidad to move the . . . [t]railer and [its] necessary contents in order to perform the contract [with] the Texas Department of Transportation."

The Meltons also asserted that Big Creek and WFMM were negligent and grossly negligent "in the[ir] retention of Trinidad" as an employee and in their allowing Trinidad to continue operating Big Creek pickup trucks and pulling trailers, when Big Creek knew or should have known that Trinidad: (1) was convicted on June 3, 2020 of the offense of driving while intoxicated in Burleson County, Texas

_____

12  As to WFMM, the Meltons alleged that because WFMM was the general partner of Big Creek and would execute contracts with the Texas Department of Transportation "to benefit" WFMM and Big Creek, WFMM was jointly and severally liable, along with Big Creek, "for the damages suffered by [the Meltons] at the hands of" Trinidad, Big Creek's employee.

22

where Big Creek "had a contract with [the Texas Department of Transportation] for highway construction"; (2) received a "safety violation ticket" from a Big Creek superintendent for "backing into 'skid/steer,'" while using a Big Creek vehicle, and causing property damages; (3) was arrested in Sante Fe, New Mexico on October 26, 2019 for the offense of driving while intoxicated and the infractions of speeding fifty miles per hour over the speed limit and having no insurance; (4) was the "at fault driver involved in a [vehicle collision]" on June 24, 2019, while using a Big Creek vehicle, and received a "safety violation ticket" from a Big Creek superintendent for failure to control a pickup truck; (5) was "the contributing fault driver," in a vehicle collision on June 23, 2019 in Brazos County, Texas causing property damage; (6) received a "safety violation ticket" from a Big Creek supervisor on October 24, 2018, for failing to wear a safety reflective vest while on a jobsite thereby violating Big Creek policy; (7) was operating a vehicle on July 2, 2016 in McClennan County, Texas when he was involved in a vehicle collision which resulted in him striking "a concrete base for a light pole" and causing property damage; (8) was the "at fault operator of a motor vehicle involved in a [car] collision," on November 16, 2014, that resulted in property damage; (9) received a "safety violation ticket" for causing a collision on February 12, 2012 while driving a Big Creek vehicle and striking a fence; (10) received a "safety violation ticket" on October 24, 2011 for not wearing a hard hat while on the job in violation of Big

Creek policy; and (11) had an expired driver's license when hired by Big Creek. Big Creek and WFMM's negligence was the proximate cause of the Meltons' damages.

As to their vicarious liability claim against Big Creek and WFMM, the Meltons asserted that Trinidad, at the time of the vehicle collision, was acting within the scope and course of his employment with Big Creek because he was pulling Big Creek's trailer. And as such, Big Creek and WFMM were liable under the doctrine of respondeat superior for the negligent acts of Trinidad.

As to damages, the Meltons sought reasonable past and future medical expenses, past and future physical pain and suffering, including scarring, past and future physical impairment, loss of past and future earnings, loss of past and future household services, loss of consortium, mental anguish, and disfigurement. And the Meltons sought exemplary damages.

The Meltons also filed a response to Big Creek and WFMM's summary-judgment motion and supplement. In their response, the Meltons noted that Big Creek and WFMM's summary-judgment motion focused on the duty element of the Meltons' negligence claims. But according to the Meltons, Big Creek and WFMM owed them a duty as Trinidad's employer because he was acting in the course and scope of his employment while he was driving back to the Super 8 motel

in Giddings on Sunday, November 8, 2020, so that he could start work on Monday.[13] The Meltons asserted that this was obvious because Big Creek was paying for Trinidad's motel room in Giddings,[14] which was near the jobsite where he would be working the following week, and because he was towing a Big Creek trailer holding equipment that was essential to the Trinidad's crew's work. Additionally, according to the Meltons, there was evidence that other Big Creek foremen or supervisors had moved Big Creek trailers in the past, and trailers left at jobsites were susceptible to theft. Further, Trinidad had "stopped at Big Creek's Lorena plant over the weekend; a plant where he could restock equipment." Because such evidence created issues of material fact as to whether Trinidad was acting in the course and scope of his employment at the time of the vehicle collision with Johnnie, the Meltons requested that the trial court deny summary judgment on their direct liability and vicarious liability negligence claims.

The Meltons attached to their summary-judgment response additional excerpts from Treto's deposition testimony. In his deposition, Treto testified that Trinidad told him that Big Creek had bought him a trailer for work, and Trinidad

---

[13]   The Meltons, in their response, asserted that the "coming and going rule" did not apply because the special-mission exception was applicable to the case.

[14]   The Meltons also asserted that Big Creek and WFMM reimbursed Trinidad for his travel expenses, including fuel, lodging, and food.

would use the trailer to store his tools at the jobsite. It was not Trinidad's trailer though, Big Creek-owned it; but it was Trinidad's responsibility.

Treto also testified that he had seen Trinidad pull the Big Creek trailer with his personal pickup truck, but Trinidad typically drove a pickup truck owned by Big Creek. Trinidad never used the Big Creek-owned pickup truck for personal use because Big Creek did not allow it. Treto, who also worked for Big Creek, had never pulled Big Creek equipment with his personal pickup truck.

Treto further testified that Trinidad would pull the Big Creek trailer to Waco sometimes because he did not want to leave it at a motel. Trinidad had the right to make sure the trailer was safe and in a good location. Trinidad would also sometimes keep the Big Creek trailer at the motel where he was staying so that it would be close to the jobsite or if he was concerned about the safety of the trailer in Big Creek's storage yard. However, Treto also noted that sometimes the Big Creek trailers "live[d]" at the jobsite, and there was a storage yard where the trailer could be left. Treto did not know if Trinidad was authorized to take a Big Creek trailer with him on the weekend of the vehicle collision.

Additionally, Treto testified that at the time of the vehicle collision, Trinidad was pulling the Big Creek trailer to a motel where Big Creek was providing rooms for Trinidad's crew. The weekend of the vehicle collision, Trinidad had been in Waco staying at his sister's house, and the family had a get-together at the house on

26

Saturday night. Trinidad drank two or three beers that night. Trinidad's personal pickup truck was parked at his sister's house all weekend, with the Big Creek trailer hitched to it.

Treto also testified that at times, Trinidad would go to Big Creek's Lorena plant to pick up safety items for his crew, but Treto did not know how often that happened or whether Trinidad went to the Lorena plant the weekend that the vehicle collision occurred. Trinidad would not take the Big Creek trailer to the Lorena plant though, only his personal pickup truck.

Treto further testified that he did not know if Trinidad was allowed to use a Big Creek fuel card on his personal pickup truck if he was pulling a Big Creek trailer, but Treto also stated that Big Truck did not allow employees to use the fuel card to put gas in their personal vehicles. Treto did not know which, if any, of Trinidad's actions had been authorized by Big Creek management. For instance, he did not know whether Big Creek management allowed Trinidad to pull the Big Creek trailer off the jobsite, and he did not know what Trinidad was instructed to do with the trailer for his crew other than that Trinidad was allowed to put tools, sensors, and keys inside it.

The Meltons also attached to their summary-judgment response additional excerpts from Martinez's deposition testimony. In his deposition, Martinez testified that he was a machine operator for Big Creek, and in that role, he "place[d] down

27

asphalt." Martinez had the same job in November 2020, and he was part of a road crew for Big Creek.

Martinez's current supervisor had a Big Creek pickup truck assigned to him, and he would sometimes pull a Big Creek trailer with his truck. Yet, the supervisor did not ever take the trailer home from the jobsite. If the trailer was not being used, it was either left in a storage yard or on the side of the road. After a job was complete, the trailer would be taken to the next jobsite. Martinez's previous supervisor drove his personal pickup truck to work, but he never pulled a Big Creek trailer with his personal pickup truck. Martinez never took a Big Creek trailer home with him, and he was not aware of anyone taking a Big Creek trailer to their home. Additionally, Martinez never pulled a Big Creek trailer with his personal vehicle, and no one he ever worked with had pulled a Big Creek trailer with their personal vehicle. According to Martinez, it was against Big Creek policy to use a personal vehicle to do Big Creek work; an employee was only allowed to drive their personal vehicle from his home to a jobsite and back.

Martinez further testified that there were times when his asphalt crew would stay at a motel that was paid for by Big Creek. Big Creek did not pay Martinez for his travel time from his home to the motel. When Martinez was working at a jobsite away from his home, he received $15 a day to help pay for food and gas. On Sunday, November 8, 2020, Martinez drove his personal pickup truck from his home in

Mexia to Giddings because he "needed to start out the job the next morning . . . in Giddings." Martinez would drive a Big Creek pickup truck from the motel to the jobsite on Monday.

As to Trinidad, Martinez testified that Trinidad was the foreman of the asphalt crew that was working at the Bastrop jobsite. Trinidad's Big Creek pickup truck was in the shop. There were two other Big Creek pickup trucks that were assigned to two other members of the crew. Trinidad and the two other crew members with Big Creek pickup trucks would drive those trucks to and from the jobsite. Because Trinidad was the foreman of the crew, he would have had a trailer where all the tools for the job were kept and that could be locked. Martinez described the trailer as "a closed-in trailer" with doors at the back, like a "U-Haul" trailer. (Internal quotations omitted.) It was owned by Big Creek.

According to Martinez, on Thursday, November 5, 2020, Trinidad's asphalt crew was working in Giddings, and on Friday, November 6, 2020, Trinidad's crew was working in Bastrop. While working in Giddings, Trinidad would keep the Big Creek trailer at the storage yard, which was fenced and could be locked. Martinez stated that the crew began "actual physical work" in Bastrop on November 6, 2020. That morning, Trinidad had picked up the Big Creek trailer from the storage yard. At the end of the workday on November 6, 2020, Martinez assumed that Trinidad was either going to leave the Big Creek trailer at the storage yard in Giddings or take

29

it with him, but Trinidad would not have left it at the Bastrop jobsite. Martinez would not know if Trinidad was taking the trailer to Waco though.

Additionally, the Meltons attached to their summary-judgment response excerpts from the deposition testimony of Carol Stone, a Big Creek employee. In her deposition, Stone testified that Big Creek did "[h]eavy highway" construction. Big Creek's corporate office was in Lorena. Related to Big Creek's work in November 2020 in Giddings, Stone testified that employees working at the Giddings jobsite stayed at the Super 8 motel in Giddings, and Big Creek paid for their motel rooms. Big Creek would lease a block of rooms at the motel to be set aside for employees so that they would be available if an employee wanted to stay. Trinidad was assigned to the asphalt crew, and he was a foreman. Trinidad did not work on either Saturdays or Sundays.

Stone further testified that at the time of the vehicle collision, Trinidad was pulling a Big Creek-owned trailer, and he was driving on Highway 77. Stone did not know where Trinidad was going. Before the vehicle collision, Trinidad's fuel card was used. Stone did not believe that Trinidad was acting in the course and scope of his employment at the time of the vehicle collision. Trinidad was not supposed to the take the Big Creek trailer off the jobsite. But Trinidad was taking the trailer back to the jobsite; it contained items used at the jobsite.

30

The Meltons also attached to their summary-judgment response a "Workers Compensation – First Report of Injury or Illness" form that was completed by Stone related to the vehicle collision. The form listed the location of the vehicle collision as Highway 77 near Chilton, Texas and noted that a Big Creek enclosed trailer had been damaged. In her deposition testimony, Stone noted that she had filed the "report only form" with a "workers' compensation carrier" to notify it that a Big Creek employee had died. According to Stone, she filed the "report only form" to let the insurance company "know that it happened" so that it would not "be blindsided if someone made a claim." But she did not think that the vehicle collision was a workers' compensation issue.

Further, the Meltons attached to their summary-judgment response additional excerpts from the deposition testimony of Wolfe. Wolfe noted that Trinidad was an employee of Big Creek and the foreman of an asphalt crew. Following the vehicle collision, "a report of injury" was made to Big Creek's "[w]orker's [c]ompensation carrier" for information purposes only.

As to the trailer, Wolfe testified that it was owned by Big Creek, and it would have been "assigned to the crew." If the trailer had been assigned to a crew's foreman, it would have been his responsibility to make sure that it was safe and secure.

31

Wolfe also explained that Big Creek paid for Super 8 motel rooms for its hourly and salaried employees. At a jobsite, employees could leave certain equipment and pickup trucks overnight, although Big Creek-owned pickup trucks were typically driven away at night.

According to Wolfe, Trinidad should not have used a Big Creek fuel card to fill up his personal pickup truck with gas even if his Big Creek pickup truck was not available for him to use. Employees were allowed to drive their personal vehicles home from a jobsite and back, but they were not allowed to use the fuel cards while driving their personal vehicles. Employees were not allowed to use their personal vehicles for any Big Creek business unless they had a "Vehicle Use Agreement."

Additionally, the Meltons attached to their summary-judgment response a "Major Crash Investigation" report by the Texas Highway Patrol Division. The "Investigator's Memo" contained in the report noted that the vehicle collision involving Trinidad and Johnnie occurred on Sunday, November 8, 2020 on Highway 77 in Falls County at about 4:20 p.m. Trinidad was driving a Dodge Ram pickup truck and towing a box trailer. Johnnie was driving a Ford F-350 pickup truck. Trinidad was driving his pickup truck southbound on the two-lane highway, but before the vehicle collision, a witness saw Trinidad's truck cross the yellow center line separating the southbound and northbound lanes of travel. Trinidad's pickup truck struck the front left side of Johnnie's pickup truck with the front left side of

his pickup truck. Johnnie's pickup truck rolled an unknown number of times before coming to rest on its wheels. Trinidad's pickup truck continued southbound rotating counterclockwise until it came to rest across the entire roadway. Before the vehicle collision, Trinidad was seen "swerving back and forth between the shoulder and the oncoming lane of traffic."

Trinidad was pronounced dead at the scene of the vehicle collision, and Johnnie suffered a left hip fracture, muscle tear in his right lower leg, and several broken bones in his right foot. Later testing showed that Trinidad's blood alcohol concentration was 0.150 grams of alcohol per 100 milliliters of blood, indicating that he was intoxicated at the time of the vehicle collision.

The Investigator's Memo also explained that law enforcement spoke to Trinidad's family, who stated that Trinidad had been drinking alcohol earlier in the day on November 8, 2020 and became angry when his family members told him to stop because he had to "drive later." Trinidad, who had been at his parents' home, left. Trinidad's brother stated that Trinidad might have gone to his sister's house to pick up clothes, but he did not recall when Trinidad left. Trinidad could have been intoxicated when he left his parents' house.

Trinidad's brother also did not know Trinidad's intended destination on the afternoon of November 8, 2020, but he thought he was going to the "Bryan/College Station" area of Texas where he had been staying. Trinidad's brother also stated that

Trinidad had been "staying in a [m]otel in Giddings . . . for work." When asked why Trinidad "might have been on the road he was [driving] on" at the time of the vehicle collision, Trinidad's brother did not know. According to his brother, Trinidad worked as a "supervisor for an asphalt crew and the last day he worked was on Friday[,] November 6, 2020." His brother also stated that Trinidad "stopped by the office on Saturday[,] November 7[,] [2020] to pick up the trailer he was towing but did not perform any work."

Finally, the Meltons attached to their summary-judgment response excerpts from the deposition testimony of Texas Department of Public Safety State Trooper J. Duncan, who testified that during his investigation of the vehicle collision he sought to determine if Trinidad was "authorized to be pulling [a] trailer" on November 8, 2020. Duncan spoke to someone "at Big Creek's office" and was told that Trinidad "was a supervisory for a . . . paving crew . . . and it[] [was] not uncommon for them to pick up the trailer when they're off to get ready . . . to get to the next job."[15]

The trial court held a hearing on Big Creek and WFMM's summary-judgment motion. Following the hearing, the Meltons filed their first motion for leave to file a supplemental response to the summary-judgment motion as well as a supplemental response. They attached excerpts from additional deposition testimony to their

---

[15] Big Creek and WFMM filed a reply to the Meltons' summary-judgment response.

34

supplemental response. After Big Creek and WFMM responded to the Meltons' motion for leave and supplemental response, the trial court granted the Meltons' motion and considered their supplemental response and its attached evidence in making its summary-judgment ruling.

The Meltons then filed a second motion for leave to file a supplemental response to Big Creek and WFMM's summary-judgment motion to which they attached additional pages of deposition testimony. In their motion, the Meltons asserted that they had inadvertently left out certain pages of the deposition testimony of Dalsing when they filed their first supplemental response to the summary-judgment motion. Big Creek and WFMM opposed the Meltons' second motion for leave.

Subsequently, the trial court, without specifying the ground, granted Big Creek and WFMM summary-judgment motion and ordered that the Meltons take nothing on their negligence claims against Big Creek and WFMM.

The Meltons then filed a motion for reconsideration of the trial court's summary-judgment ruling, which the trial court denied. The trial court also denied the Meltons' second motion for leave to file a supplemental response to Big Creek and WFMM's summary-judgment motion.

## Summary Judgment

In their first issue, the Meltons argue that the trial court erred in granting Big Creek and WFMM summary judgment on the Meltons' vicarious liability negligence claim because a fact issue existed as to whether Trinidad was "acting in the course and scope of his employment" with Big Creek at the time of the vehicle collision. In their fourth issue, the Meltons argue that the trial court erred in granting Big Creek and WFMM summary judgment on the Meltons' direct liability claims for negligence, gross negligence, negligent entrustment, negligent supervision or control, and negligent training because Big Creek and WFMM "did not move for summary judgment on" those claims.

We review a trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). In conducting our review, we take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Valence Operating*, 164 S.W.3d at 661; *Knott*, 128 S.W.3d at 215. If a trial court grants summary judgment without specifying the grounds for granting the motion, we must uphold the trial court's judgment if any of the asserted grounds are meritorious. *Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 148 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

A party seeking summary judgment may combine in a single motion a request for summary judgment under the no-evidence standard with a request for summary judgment as a matter of law.[16] *Binur v. Jacobo*, 135 S.W.3d 646, 650–51 (Tex. 2004). To prevail on a matter-of-law summary-judgment motion, the movant must establish that no genuine issue of material fact exists and the trial court should grant judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999). When a defendant moves for a matter-of-law summary judgment, it must either: (1) disprove at least one essential element of the plaintiff's cause of action, or (2) plead and conclusively establish each essential element of an affirmative defense, thereby defeating the plaintiff's cause of action. *See Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995); *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). Once the movant meets its burden, the burden shifts to the non-movant to raise a genuine issue of material fact precluding summary judgment. *See Siegler*, 899 S.W.2d at 197; *Transcon. Ins. Co. v. Briggs Equip. Trust*, 321 S.W.3d 685, 691 (Tex. App.—Houston [14th Dist.] 2010, no pet.). The evidence raises a genuine issue of fact if

---

[16]     Although Big Creek and WFMM moved for summary judgment on both no-evidence and matter-of-law grounds, because it is dispositive of the Meltons' appeal, we only review the trial court's ruling on Big Creek and WFMM's matter-of-law summary-judgment motion. *See Mejia-Rosa v. John Moore Servs., Inc.*, No. 01-17-00955-CV, 2019 WL 3330972, at *5 (Tex. App.—Houston [1st Dist.] July 25, 2019, no pet.) (mem. op.); *see also* TEX. R. APP. P. 47.1.

reasonable and fair-minded fact finders could differ in their conclusions in light of all the summary-judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007).

## A. Vicarious Liability Claim

In their first issue, the Meltons argue that the trial court erred in granting summary judgment on their vicarious liability negligence claim against Big Creek and WFMM because "material questions of fact [existed] as to whether [Trinidad] was acting in the course and scope of his employment" with Big Creek at the time of the vehicle collision and as to whether the special mission exception to the "coming and going rule" applied to Trinidad.

The common-law doctrine of respondeat superior, or vicarious liability, is an exception to the general rule that a person has no duty to control another's conduct. *Painter v. Amerimex Drilling I, Ltd.*, 561 S.W.3d 125, 130–31 (Tex. 2018). It provides that "liability for one person's fault may be imputed to another who is himself entirely without fault solely because of the relationship between them." *Id.* at 130 (internal quotations omitted).

To prove an employer's vicarious liability for an employee's negligence, the plaintiffs must show that, at the time of the negligent conduct, the employee was acting in the course and scope of his employment. *Id.* at 131. In the "course and scope of employment" means within the scope of the employee's general authority,

in furtherance of the employer's business, and for the accomplishment of the object for which he was hired. *Id.* Additionally, to be within the scope of employment, the employee's act must be of the same general nature as, or incidental to, the authorized conduct. *Id.* Thus, if an employee deviates from the performance of his duties for his own purposes, his employer is not responsible for what occurs during that deviation. *Id.*

Big Creek and WFMM moved for summary judgment as a matter of law on the Meltons' vicarious liability negligence claim arguing that they owed no legal duty to the Meltons because Trinidad was not acting in the course and scope of his employment with Big Creek at the time of the vehicle collision. According to Big Creek and WFMM, the "coming and going rule" applied and the Meltons could not establish an exception to the "coming and going rule" as a matter of law.

The "coming and going rule" provides that an employee is not acting in the course and scope of his employment when he is driving to and from work. *Id.* at 139; *Mejia-Rosa v. John Moore Servs., Inc.*, No. 01-17-00955-CV, 2019 WL 3330972, at *6 (Tex. App.—Houston [1st Dist.] July 25, 2019, no pet.) (mem. op.). The "coming and going rule" reflects that a vehicle collision while traveling to and from work does not generally arise from a person's employment but instead from the risks and hazards inherent to the driving public. *See Smith v. Tex. Emp. Ins. Ass'n*, 105 S.W.2d 192, 193 (Tex. [Comm'n Op.] 1937); *see also City of Houston v.*

39

*Stoffer*, No. 01-23-00335-CV, 2024 WL 3417137, at *4 (Tex. App.—Houston [1st Dist.] July 16, 2024, pet. filed) (mem. op.) ("The rationale informing the rule is that travelers on public roads are equally susceptible to the hazards of doing so, whether employed or not."). "Such travel hazards do not arise out of the business of an employer; thus, the law does not hold the employer liable for injuries resulting from engaging in these risks." *Cameron Int'l Corp. v. Martinez*, 662 S.W.3d 373, 376 (Tex. 2022).

It is undisputed that the vehicle collision happened in the afternoon on Sunday, November 8, 2020, and Trinidad was driving his personal pickup truck at the time of the collision. *See Farrell v. Comm. Structures & Interiors, Inc.*, No. 05-02-00031-CV, 2002 WL 31411022, at *1 (Tex. App.—Dallas Oct. 28, 2002, no pet.) (not designated for publication) ("Generally, an employee is not in the course and scope of employment while traveling in his own vehicle to and from work."); *Wilie v. Signature Geophysical Servs., Inc.*, 65 S.W.3d 355, 359 (Tex. App.—Houston [14th Dist.] 2001, pet. denied); *Chevron, U.S.A., Inc. v. Lee*, 847 S.W.2d 354, 355–56 (Tex. App.—El Paso 1993, no writ); *cf. Robertson Tank Lines, Inc. v. Van Cleave*, 468 S.W.2d 354, 357 (Tex. 1971) (presumption arose that driver of truck acting in scope of his employment when collision occurred where truck owned by defendant and driver was employed by defendant). In their appellees' brief, Big Creek and WFMM acknowledge that Trinidad was "driving from Waco to a [m]otel

40

in Giddings" when the vehicle collision occurred, and thus, they assert that he was, "at the very most, commuting" in his personal pickup truck.

To establish that Trinidad was not acting in the course and scope of his employment with Big Creek, but rather was commuting, on Sunday, November 8, 2020, Big Creek and WFMM attached to their summary-judgment motion the affidavit of Dalsing, a general superintendent employed by Big Creek. In his affidavit, Dalsing testified that Trinidad was employed by Big Creek as an asphalt superintendent or a foreman of an asphalt crew. In November 2020, Trinidad reported to Dalsing and Dalsing was responsible for "directing the work of [Trinidad] and his asphalt crew." As of November 6, 2020, Trinidad was assigned to a Bastrop jobsite near Giddings.

Dalsing testified that before his death, Trinidad's last day of work with Big Creek was Friday, November 6, 2020. Trinidad had the weekend—November 7, 2020 and November 8, 2020—off work, and Trinidad drove his personal pickup truck to Waco that weekend. Trinidad was not due back to work until Monday, November 9, 2020, and Trinidad would not be compensated by Big Creek until November 9, 2020 "when his [asphalt] crew resumed work on the Bastrop job[site]." Trinidad could drive to the Bastrop jobsite from Waco on Monday morning, or he could drive to Giddings on Sunday, November 8, 2020 and spend the night at a Super 8 motel. Dalsing did not tell Trinidad to drive to Giddings on November 8, 2020,

41

and he had no knowledge of Trinidad's travel plans on November 8, 2020. Big Creek did not require Trinidad to drive to Giddings or stay at the Super 8 motel on November 8, 2020, although it would have paid for Trinidad's motel room if he had wanted to stay there on the night of November 8, 2020.

Big Creek and WFMM also attached to their summary-judgment motion excerpts from the deposition testimony of Martinez, a member of Trinidad's asphalt crew in November 2020. Martinez testified that from June 2020 to November 5, 2020, his asphalt crew worked at a jobsite near Giddings where Trinidad was the foreman. On Friday, November 6, 2020, the asphalt crew began working at a Bastrop jobsite. Friday was the crew's last day of work, and after work on Friday, Martinez drove home to Mexia in his personal vehicle. Sunday, November 8, 2020 was not a workday for the asphalt crew. Martinez drove to the Super 8 motel in Giddings on November 8, 2020, but he was not required to do so. Martinez received no compensation from Big Creek until he arrived at the Bastrop jobsite on Monday, November 9, 2020.

Additionally, Big Creek and WFMM attached to their summary-judgment motion excerpts from the deposition testimony of Treto, Trinidad's father, and Murillo, Trinidad's sister. Treto testified that on the weekend of November 8, 2020, Trinidad was in Waco visiting his family. And Murillo explained that Trinidad arrived at her parents' home on the night of Friday, November 6, 2020 after leaving

42

work.  Trinidad was driving his personal pickup truck on November 6, 2020 and came straight from work to their parents' home.  According to Treto, Trinidad drove his personal pickup truck "all his hours when he was off of work."

Murillo also testified that Trinidad stayed at her home all weekend, until about 3:00 p.m. on Sunday, November 8, 2020, when Trinidad left.  According to Murillo, Trinidad left on Sunday to go to the motel in Giddings "to get ready for Monday." Trinidad was not working on Sunday, November 8, 2020; he was commuting to the motel.

We conclude that Big Creek and WFMM established as a matter of law that the "coming and going rule" applied in this case.  Trinidad was, at most, commuting at the time of the vehicle collision and was not acting in the course and scope of his employment with Big Creek.  *See Wilie*, 65 S.W.3d at 359 ("An employee is generally not in the course and scope of employment while driving his own vehicle to and from his place of work."); *cf. Gant v. Dumas Glass & Mirror, Inc.*, 935 S.W.2d 202, 212 (Tex. App.—Amarillo 1996, no pet.) (even though employee driving employer's truck at time of collision, employee not acting in course and scope of his employment when returning from eating lunch and was en route to work).  Thus, the burden then shifted to the Meltons to establish a genuine issue of material fact precluding summary judgment.

In their summary-judgment response, the Meltons asserted that a fact issue existed as to whether Trinidad was acting in the course and scope of his employment at the time of the vehicle collision because Big Creek was paying for Trinidad's motel room in Giddings, which was where he was heading on Sunday, November 8, 2020, and near the Bastrop jobsite where he would be working the following week, Big Creek and WFMM reimbursed Trinidad for his travel expenses, including fuel, lodging, and food, Trinidad was pulling a Big Creek trailer holding equipment used by Trinidad's asphalt crew, and Trinidad "stopped at Big Creek's Lorena plant over the weekend; a plant where he could restock equipment."

However, the facts of this case are like those in *Smith v. Universal Electric Construction Co.*, 30 S.W.3d 435 (Tex. App.—Tyler 2000, no pet.). In *Smith*, Thomas Rodgers worked for Universal Electric Construction Company ("Universal") as a laborer on a four-man crew building substations. *Smith*, 30 S.W.3d at 437. Rodgers was assigned to work at a building project about two-and-a-half hours away from his home. *Id.* Instead of returning to his home each night, Universal gave Rodgers the option of staying, at Universal's expense, in a motel near his jobsite. *Id.* At the end of a workday, Rodgers would drive his personal pickup truck back to the motel to stay the night. *Id.*

One night, while Rodgers was driving his pickup truck to the motel, he struck and injured Charles Brian Smith, the plaintiff, who was driving a motorcycle. *Id.* at

44

437–38. Smith then sued Universal, asserting that Universal was vicariously liable for Rodgers's negligence. *Id.* at 438.

On appeal, the appellate court noted that employers may be held liable for the negligent acts of their employees under a theory of respondent superior if the employees' actions were in the course and scope of their employment. *Id.* It also explained that in Texas, employers are not liable for vehicle collisions involving their employees while they are traveling to and from work. *Id.* And that rule had been extended to employees traveling to and from a temporary job site, even when their employer was providing mileage reimbursement for the employee's travel. *Id.*

The court then held that Rodgers was not acting in the course and scope of his employment when he was traveling in his personal pickup truck to his motel after completing his work for the day. *Id.* at 438–39, 441. The fact that Universal was paying for Rodgers's motel room or that Rodgers was staying at the motel overnight while he worked on a building project for Universal that was far from his home did not transform Rodgers's commute to an act in the course and scope of his employment with Universal. *Id.* at 440–41.

Here, the Meltons are incorrect that the fact that Big Creek was paying for Trinidad's motel room in Giddings, which was where he was heading on Sunday, November 8, 2020, and near the Bastrop jobsite where he would be working the following week, does not raise a genuine issue of material fact that Trinidad was

45

acting in the course and scope of his employment at the time of the vehicle collision. *See id.* Further, to the extent that the Meltons are correct that Big Creek and WFMM were reimbursing Trinidad for his travel expenses on Sunday, November 8, 2020, this also does not raise a genuine issue of material fact that Trinidad was acting in the course and scope of his employment at the time of the vehicle collision. *See Duran v. United States*, No. 2:20-CV-00179, 2023 WL 2499941, at *4 (S.D. Tex. Feb. 21, 2023) (order) (applying Texas law to determine coming and going rule applied even if employee was driving employer-owned vehicle and being reimbursed for travel expenses); *Silvas v. Harrie*, No. P:17-CV-00034-DC, 2018 WL 6427345, at *3 (W.D. Tex. Oct. 4, 2018) (order) ("Texas courts have held that an employer is not liable even when it furnishes or pays for its employee's transportation or reimburses its employee for travel expenses . . . ."); *Mancil v. Stroud*, No. 11-13-00354-CV, 2016 WL 932949, at *4 (Tex. App.—Eastland Mar. 10, 2016, no pet.) (mem. op.) (employee not acting in course and scope of employment at time of collision even where employee compensated for his fuel costs); *Wilson v. H.E. Butt Grocery Co.*, 758 S.W.2d 904, 907 (Tex. App.—Corpus Christi–Edinburg 1988, no writ) (mileage compensation does not place employee in course and scope of employment while traveling to and from work).

Additionally, as to the Meltons' assertion that because Trinidad was pulling a Big Creek-owned trailer containing work-related equipment at the time of the

46

vehicle collision, a genuine issue of material fact existed as to whether Trinidad was acting in the course and scope of his employment, we disagree. Texas courts have previously explained that "[m]erely transporting work-related items is insufficient, by itself, to keep [an employee] within the course and scope of his employment." *Farrell*, 2002 WL 31411022, at *2 (although employee was transporting job-related equipment with personal vehicle, not acting in course and scope of his employment where employee was communting from his home to his jobsite); *see also Soto v. Seven Seventeen HBE Corp.*, 52 S.W.3d 201, 207–08 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (holding evidence sufficient to support jury's finding that employee was not acting in course and scope of his employment where employee was driving from his home to work to return his employer's keys); *Direkly v. ARA Devcon, Inc.*, 866 S.W.2d 652, 654–55 (Tex. App.—Houston [1st Dist.] 1993, writ dism'd w.o.j.) (although employee was transporting briefcase containing work papers home at time of vehicle collision with intent to work at home, evidence insufficient to raise fact issue on course and scope of employment where employee was involved in collision en route to her home).

The Meltons, in their summary-judgment response, also sought to invoke the "special mission exception" to the "coming and going rule." In doing so, they argued that Trinidad was acting in the course and scope of his employment because he was on a special mission for Big Creek.

47

The "special mission" doctrine is an exception to the general rule that an employee is not acting in the course and scope of his employment when driving his own or another vehicle to and from work. *See Mancil v. Stroud*, No. 11-13-00354-CV, 2016 WL 932949, at *6 (Tex. App.—Eastland Mar. 10, 2016, no pet.). But to be on a special mission, an employee must be completing a special task at his employer's direction or performing a generally assigned duty "in furtherance of [his] employer's business with express or implied approval of [his] employer." *Painter*, 561 S.W.3d at 136, 139; *see also Upton v. Gensco, Inc.*, 962 S.W.2d 620, 621 (Tex. App.—Fort Worth 1997, pet. denied). Assigned duties are not anything tangentially work related, but rather, they must involve an expected and defined job responsibility, such as the contractually assigned duty to transport coworkers to and from a jobsite as recognized by the Texas Supreme Court in *Painter*. *See Painter*, 561 S.W.3d at 139.

In their summary-judgment response, the Meltons argued that the "special mission exception" applied in the instant case because "[r]emote construction work[,] like that [Trinidad] performed[,] has often fallen under the special-mission exception." In doing so, the Meltons relied on the Texas Supreme Court's opinion in *Painter*.

In *Painter*, a drilling-company employee, J.C. Burchett, was driving three of his coworkers from a drilling site to an employer-provided bunkhouse after a shift

48

when he struck a car, causing a rollover. *Id.* at 128–29. Two of the coworkers were killed, while Burchett and the third coworker, Steven Painter, were injured. *Id.* at 129. Painter filed suit against his employer, alleging that the employer was vicariously liable for Burchett's negligence. *Id.* The employer then moved for summary judgment, arguing that it was entitled to judgment as a matter of law on Painter's vicarious liability negligence claim because the employer did not control the details of Burchett's work at the time of the vehicle collision and thus Burchett was not acting in the course and scope of his employment. *Id.* at 130. After the trial court granted the employer's summary-judgment motion, Painter appealed. *Id.*

On appeal, the Texas Supreme Court explained that it had long recognized that an employer was vicariously liable for its employee's negligent acts if those acts were in the course and course of his employment. *Id.* at 131. Whether an employee was acting in the course and scope of his employment hinged on an objective assessment of "whether the employee was doing his job when he committed a [negligent] act." *Id.* at 132. And the court noted that Painter, in response to his employer's summary-judgment motion, presented evidence that one of Burchett's job duties as a driller on the drilling site was to drive his coworkers to and from the drilling site and Burchett was paid for performing that task. *Id.* at 133, 135 (Painter presented evidence "that one of [Burchett's] specific duties as a driller—and one for

49

which he was paid additional money over his regular salary—was to provide the crew transportation to and from the drilling site").

However, the employer had argued that the "coming and going rule" applied to the case making the employer not liable for the acts of its employee, Burchett, because he was traveling to and from work. *Id.* at 136. In response, the Texas Supreme Court explained that an exception existed to the "coming and going rule," which provided that an employee is acting in the course and scope of his employment when he is completing a special task at his employer's direction or is performing a generally assigned duty "in furtherance of [his] employer's business with express or implied approval of [his] employer." *Id.* at 136, 139 (alterations in original) (internal quotations omitted).

In *Painter*, the employer had contractually agreed to pay a specific employee—a driller—to carry out a specific task—driving coworkers between the bunkhouse and the drilling site. *Id.* at 137. And the employee drove his coworkers as part of his assigned job duties and was doing so at the time of the vehicle collision. *Id.* Notably, the "special mission exception" only applied because the employee was performing a regular or specifically assigned duty for the benefit of his employer. *Id.* at 139 (explaining specifically assigned duty in case was "driving other workers to the workplace").

50

Big Creek and WFMM attached to their summary-judgment motion evidence establishing that Trinidad was not performing a regular or specifically assigned duty for the benefit of Big Creek at the time of the vehicle collision. That evidence showed that Trinidad's asphalt crew began working at the Bastrop jobsite on Friday, November 6, 2020. A specific Big Creek trailer was assigned to the asphalt crew and was used to store tools. After completing work on November 6, 2020, Trinidad chose to drive his personal pickup truck and pull the Big Creek trailer to visit his family in Waco for the weekend. It was against Big Creek policy for Trinidad to use his personal pickup truck for Big Creek business, to pull a Big Creek trailer with his personal pickup truck, and to take the trailer to Waco for the weekend. Martinez, a member of Trinidad's asphalt crew, had never seen Trinidad take a Big Creek trailer home with him on the weekends. Removal of Big Creek equipment, like a Big Creek trailer, from a jobsite required management's approval, and there was no record showing that management had approved Trinidad removing the trailer from the Bastrop jobsite over the weekend the vehicle collision occurred.

Instead, Big Creek offered Trinidad's asphalt crew two options for securing their assigned trailer over a weekend: the trailer could either be taken to a Big Creek storage yard, which Trinidad had done before, or it could have been left at the jobsite. Trinidad was not "contractually obligated, compensated, or requested by Big Creek to protect or safeguard [his crew's] trailer over a weekend between work weeks."

51

Trinidad was also not compensated for the time he spent commuting to and from the jobsite, and Big Creek did not reimburse Trinidad for any expenses such as mileage or gas when he was commuting to and from a jobsite in his personal pickup truck. Dalsing, Trinidad's supervisor, did not direct Trinidad to travel to Giddings on November 8, 2020, and he had no knowledge that Trinidad was traveling in his personal pickup truck, while pulling a Big Creek trailer, on the weekend of the vehicle collision. There was not any "business reason why [Trinidad] would [have] remove[d] [a] trailer from the [Bastrop] jobsite" on November 6, 2020 and taken it to Waco with him.

Notably, in contrast to *Painter*, the Meltons, along with their summary-judgment response, presented no evidence that Big Creek had contractually agreed to pay Trinidad to carry out a specific task, namely driving the Big Creek trailer to Waco or guarding the Big Creek trailer over the weekend, or that Big Creek paid Trinidad for doing so. *Painter*, 561 S.W.3d at 137. And the Meltons presented no evidence that pulling the Big Creek trailer to Waco was one of Trinidad's assigned job duties. *Id.* The "special mission exception" only applies when an employee is performing a regular or specifically assigned duty for the benefit of his employer, which the Meltons' summary-judgment evidence does not show. *Id.* at 139 (explaining specifically assigned duty in case was "driving other workers to the workplace"); *see also Cameron*, 662 S.W.3d at 376–77

52

("special-mission exception d[id] not apply" where neither employer nor "its supervisory personnel directed [employee] to travel to [other city] or to purchase food, water, or fuel for other workers or for the worksite generally"). Accordingly, we conclude that the Meltons did not establish a genuine issue of material fact as to whether the "special mission exception" to the "coming and going rule" applied.

Based on the foregoing, we hold that the trial court did not err in granting Big Creek and WFMM summary judgment on the Meltons' vicarious liability negligence claim because Trinidad was not acting in the course and scope of his employment with Big Creek as a matter of law.

We overrule the Meltons' first issue.

## B. Direct Liability Claims

In their fourth issue, the Meltons argue that the trial court erred in granting Big Creek and WFMM summary judgment on the Meltons' direct liability claims for negligence, gross negligence, negligent entrustment, negligent supervision or control, and negligent training because Big Creek and WFMM "did not move for summary judgment on" those claims.

Generally, a trial court may not grant summary judgment on grounds that were not presented or addressed by the movants in their motion. *Nall v. Plunkett*, 404 S.W.3d 552, 555 (Tex. 2013); *Konogeris v. Pinnacle Health Facilities GP I, LLC*, 657 S.W.3d 421, 426 (Tex. App.—El Paso 2022, no pet.); *see also G & H Towing*

*Co. v. Magee*, 347 S.W.3d 293, 297 (Tex. 2011) (recognizing that "[g]ranting a summary judgment on a claim not addressed in a summary judgment motion . . . is, as a general rule, reversible error"). As a corollary to this principle, when the plaintiffs amend their pleadings to add a new claim or theory of recovery after the defendants have moved for summary judgment, the defendants must ordinarily file an amended summary judgment motion to address the newly raised claims or theories before the trial court may grant a summary judgment on the plaintiffs' entire case. *See Konogeris*, 657 S.W.3d at 426; *Blancett v. Lagniappe Ventures, Inc.*, 177 S.W.3d 584, 592 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

However, it is not necessary for the defendants to file an amended or supplemental motion if their original summary-judgment motion was broad enough to encompass and address the plaintiffs' newly raised claims or theories of liability, and so long as the motion negates at least one element of the new and previously asserted claims. *See Konogeris*, 657 S.W.3d at 426–27; *Rotating Servs. Indus., Inc. v. Harris*, 245 S.W.3d 476, 487 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (court may grant summary judgment without any amended motion where original "motion for summary judgment conclusively negates a common element of the newly and previously pleaded claims or when the original motion is broad enough to encompass the newly asserted claims" (internal quotations omitted)); *see also Judwin Props., Inc. v. Griggs & Harrison*, 911 S.W.2d 498, 502 (Tex. App.—

54

Houston [1st Dist.] 1995, no writ) (where moving parties' motion for summary judgment addressed claims that nonmovant subsequently specified and "clarified" in its amended counterclaim, there was no need for moving party to amend its summary-judgment motion).

In their second amended petition, the Meltons brought direct liability claims against Big Creek and WFMM for negligence, negligent entrustment, negligent supervision or control, and negligent training. Notably, in their second amended petition, the Meltons alleged that Big Creek and WFMM owed "a duty to exercise care that a reasonably prudent and careful person, corporation and partner would use to avoid harm to others under circumstances" like those described in the petition. Further, Big Creek and WFMM "had a duty to exercise ordinary care to be certain that Big Creek's employee Trinidad was properly licensed" and "properly trained to operate" "WFMM['s] and . . . Big Creek's . . . [t]railer," and they had a duty to "entrust [the] . . . [t]railer to properly licensed employees, properly trained employees, and qualified employees which Trinidad was not." Additionally, the Meltons alleged that Big Creek and WFMM had a "duty to exercise ordinary care to be certain that Trinidad could and would operate . . . [the] [t]railer reasonably and prudently before entrusting Trinidad to move the . . . [t]railer and [its] necessary contents in order to perform the contract [with] the Texas Department of Transportation."

According to the Meltons, their injuries and damages were proximately caused by Big Creek's and WFMM's negligence and disregard for their duties. And the Meltons alleged WFMM and Big Creek were both "jointly and severally" liable under the theories of negligence, negligent entrustment, negligent supervision or control, and negligent training. Although the Meltons alleged in their second amended petition a vicarious liability claim based on Trinidad's negligence, it is clear from their petition that they also were asserting direct liability negligence claims against Big Creek and WFMM.

After the Meltons filed their second amended petition, Big Creek and WFMM moved for summary judgment on the Meltons' direct liability negligence claims and their vicarious liability negligence claim, asserting that Big Creek and WFMM owed no duty to the Meltons. Although the Meltons filed a third amended petition in response to Big Creek and WFMM's summary-judgment motion, the third amended petition largely mirrored their second amended petition, and they again brought direct liability claims for negligence, gross negligence, negligent entrustment, negligent supervision or control, and negligent training as well as a vicarious liability claim against Big Creek and WFMM based on the purported negligent acts of Trinidad. *See Silver Gryphon, LLC v. Bank of N.Y. Mellon*, 529 S.W.3d 595, 598 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("[A]n amended, supplemental, or new motion for summary judgment is not always necessary when (1) an amended

petition 'essentially reiterates' previously pleaded theories of liability; (2) a ground asserted in a motion for summary judgment conclusively negates a common element of the newly and previously pleaded claims; or (3) the original motion is broad enough to encompass the newly asserted claims."); *In re Estate of Brown*, No. 06-16-00057-CV, 2017 WL 1173897, at *3 (Tex. App.—Texarkana Mar. 30, 2017, no pet.) (mem. op.) ("[W]here an amended petition merely reiterates the causes of action previously pleaded in an original petition, an order granting summary judgment as to the original petition resolves all of the claims pending between the parties notwithstanding the existence of an amended petition.").

The elements of a negligence cause of action are duty, breach of that duty, and damages proximately caused by the breach. *See Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990); *Dangerfield v. Ormsby*, 264 S.W.3d 904, 912 (Tex. App.—Fort Worth 2008, no pet.). "[N]egligence and gross negligence are not separable causes of action but are inextricably intertwined." *Ford Motor Co. v. Miles*, 967 S.W.2d 377, 390 (Tex. 1998) (Gonzalez, J., concurring). Further, negligent hiring, training, retention, and supervision claims are simply negligence causes of actions based on an employer's direct negligence. *Dangerfield*, 264 S.W.3d at 912. The threshold inquiry in any negligence case is whether the defendants owe a legal duty to the plaintiffs. *Phillips*, 801 S.W.2d at 525; *see also AEP Tex. Cent. Co. v. Arredondo*, 612 S.W.3d 289, 298–99 (Tex. 2020) ("The

existence of a duty of care is an element of . . . negligence, negligence per se, and gross negligence claims."); *Moore v. Strike, LLC*, No. 04-16-00324-CV, 2017 WL 96130, at *7 (Tex. App.—San Antonio Jan. 11, 2017, no pet.) (mem. op.) (agreeing duty is element of negligent hiring, retention, and supervision claims); *Knight v. City Streets, L.L.C.*, 167 S.W.3d 580, 584 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (to prevail on negligent supervision claim, plaintiff needed to prove defendant owed him legal duty to supervise its employees). The nonexistence of a duty ends the inquiry into whether negligence liability may be imposed. *Nat'l Convenience Stores Inc. v. Matherne*, 987 S.W.2d 145, 148 (Tex. App.—Houston [14th Dist.] 1999, no pet.).

Here, the entirety of Big Creek and WFMM's summary-judgment motion was focused on whether they owed a duty to the Meltons and the fact that a lack of a duty negated all the Meltons' direct liability and vicarious liability negligence claims. In fact, the Meltons, in their summary-judgment response, noted that Big Creek and WFMM's summary-judgment motion focused on the duty element of the Meltons' negligence claims. On appeal, the Meltons only argue that the trial court erred in granting Big Creek and WFMM summary judgment on the Meltons' direct liability negligence claims because they "were not addressed by [the] motion for summary judgment." But this is not the case. *See Ellis v. Precision Engine Rebuilders, Inc.*, 68 S.W.3d 894, 898 (Tex. App.—Houston [1st Dist.] 2002, no pet.) ("If summary

58

judgment may have been rendered, properly or improperly, on a ground not challenged, the judgment must be affirmed.").

Because we conclude that Big Creek and WFMM did raise arguments in their summary-judgment motion as to the Meltons' direct liability negligence claims, contrary to the Meltons' argument on appeal, we hold that the trial court did not err in granting summary judgment on the Meltons' direct liability negligence claims.

We overrule the Meltons' fourth issue.

**Second Motion for Leave**

In their fifth issue, the Meltons argue that the trial court erred in denying their second motion for leave to file a supplemental response to Big Creek and WFMM's summary-judgment motion because the Meltons had inadvertently left out certain pages of the deposition testimony of Dalsing when they filed their first supplemental response to the summary-judgment motion.

We review a trial court's ruling on a motion for leave to file a late summary-judgment response or late summary-judgment evidence for an abuse of discretion. *Carpenter v. Cimarron Hydrocarbons Corp.*, 98 S.W.3d 682, 686 (Tex. 2002); *Michal v. Nexion Health at Garland, Inc.*, No. 05-21-00693-CV, 2022 WL 16706979, at *3, *5 (Tex. App.—Dallas Nov. 4, 2022, pet. denied) (mem. op.). A trial court abuses its discretion when it acts without reference to any guiding rules

or principles.  *Carpenter*, 98 S.W.3d at 687; *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

In a summary-judgment proceeding, the non-movants may file and serve opposing affidavits or other written responses no later than seven days prior to the scheduled date of the summary-judgment hearing.  TEX. R. CIV. P. 166a(c).  The non-movants must obtain leave to file evidence after that deadline.  *Id.*

A motion for leave to file a late summary-judgment response or late summary-judgment evidence should be granted when the non-movants establish good cause for failing to timely respond by showing that (1) the failure to respond was not intentional or the result of conscious indifference, but the result of accident or mistake and (2) allowing the late response will occasion no undue delay or otherwise injure the party seeking summary judgment.  *Carpenter*, 98 S.W.3d at 688; *Michal*, 2022 WL 16706979, at *5.  Conscious indifference is more than negligence; it involves behavior such as a "pattern of ignoring deadlines and warnings from the opposing party."  *Levine v. Shackelford, Melton & McKinley, L.L.P.*, 248 S.W.3d 166, 168–69 (Tex. 2008) (discussing conscious indifference in default-judgment context).  Even if a trial court abuses its discretion by not admitting the non-movants' late summary-judgment evidence, the trial court's judgment will not be reversed unless the error "probably caused the rendition of an improper

60

judgment." TEX. R. APP. P. 44.1(a)(1); *Tex. Petroleum Land Mgmt., LLC v. McMillan*, 641 S.W.3d 831, 848–49 (Tex. App.—Eastland 2022, no pet.).

In their second motion for leave to file a supplemental response to Big Creek and WFMM's summary-judgment motion, the Meltons asserted that they had inadvertently left out a few pages of Dalsing's deposition testimony when they filed their first motion for leave to file a supplemental response and their supplemental response, to which they had attached excerpts of Dalsing's deposition testimony. Notably, the trial court, before rendering summary judgment, granted the Meltons' first motion for leave and considered their supplemental response as well as its attached evidence—excerpts from Dalsing's deposition testimony.[17]

Here, we have concluded that Big Creek and WFMM established as a matter of law that Trinidad was not acting in the course and scope of his employment at the time of the vehicle collision, and after reviewing the few pages of Dalsing's deposition testimony that the Meltons complained were "left out," we conclude that the evidence the Meltons sought to supplement does not affect our determination that Trinidad was not acting in his course and scope of his employment. Thus, any

---

[17] The trial court also considered the inadvertently admitted deposition pages in ruling on the Meltons' motion for reconsideration of the trial court's summary-judgment ruling. In their motion for reconsideration, the Meltons asserted that the trial court should have granted their second motion for leave to file a supplemental summary-judgment response so that the court could consider the missing deposition pages.

61

error by the trial court in denying the Meltons' second motion for leave to file a supplemental response to Big Creek and WFMM's summary-judgment motion was harmless. *See McMillan*, 641 S.W.3d at 849–50 (explaining because "the evidence with which [the non-movants] sought to supplement was irrelevant," to extent trial court erred in excluding it, "such exclusion was harmless").

We overrule the Meltons' fifth issue.[18]

### Conclusion

We affirm the judgment of the trial court.


Kristin Guiney
Justice

Panel consists of Chief Justice Adams and Justices Gunn and Guiney.

---

[18] Based on our resolution of the Meltons' first, fourth, and fifth issues, we need not address their second and third issues. *See* TEX. R. APP. P. 47.1.